N.F. v O.F. (2024 NY Slip Op 50506(U))

[*1]

N.F. v O.F.

2024 NY Slip Op 50506(U)

Decided on April 25, 2024

Supreme Court, Westchester County

Patel, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 25, 2024
Supreme Court, Westchester County

N.F., Plaintiff,

against
O.F., Defendant.

Index No. 64592/2021

Counsel for Plaintiff: Mitchell Lieberman, Esq., and Remy Lieberman, Esq., of Lieberman & Lieberman PLLC
Counsel for Defendant: Jeff Klein, Esq., of Mulhern & Klein

Anar Rathod Patel, J.

The Court presided over a seventeen (17)-day non-jury trial in this matter on the following dates: October 23, 24, 30, November 1, 8, 9, 13, 15, 16, 28, 30, December 1, 5, 6, 8, 11, 12, 2023,[FN1]
as to the issues of custody and access, and financial resolution of child support, equitable distribution, and counsel fees. Plaintiff was represented by Mitchell Lieberman, Esq. and Remy Lieberman, Esq., of the law office of Lieberman & Lieberman PLLC. Defendant was represented by Jeff Klein, Esq. of Mulhern & Klein. The parties' three children were represented by Attorney for the Children ("AFC") Gloria Marchetti-Bruck, Esq. of Gloria Marchetti-Bruck, Esq.
Parties filed the consolidated trial transcripts ("Tr.") on January 4, 2024, and post-trial memoranda on January 31, 2024. See NYSCEF Doc. Nos. 558—570. After considering the sworn testimony of the parties in addition to the nine (9) witnesses at trial, the Lincoln hearing [*2]with the parties' three children, the documents as well as audio and video recordings admitted into evidence, and the post-trial submissions, the Court hereby makes the following findings of fact and reaches the following conclusions of law.
Relevant Factual and Procedural History
The parties were married on November 21, 2010, and are the parents of [REDACTED], [REDACTED], and [REDACTED], (collectively, the "Children"). Upon their marriage, the parties relocated to [REDACTED], where they purchased the marital residence located at [REDACTED] ("Marital Residence") on or around November 3, 2010. Plaintiff grew up generally in [REDACTED], where she attended high school; her father and stepmother also reside in [REDACTED]. 
On June 17, 2021, Plaintiff commenced a separate divorce proceeding under Index Number 58260/2021 for dissolution of the marriage pursuant to DRL § 170(7). The parties, represented by counsel, entered into an interim parenting agreement on July 23, 2021, wherein they sought to resolve certain issues related to their impending divorce including jointly residing in the Marital Residence, an interim access schedule with the Children, and an agreement to "refrain from engaging in any conduct sufficient to make out a family offense under Article 8 of the Family Court Act." Def. Ex. L (7/23/21 Interim Agreement). The parties filed a stipulation of discontinuance of said action on July 23, 2021. 
Less than three months later, on October 8, 2021, Plaintiff commenced the instant divorce proceeding by the filing of a Summons and Complaint for dissolution of the marriage pursuant to DRL § 170(7). The case was initially assigned to the Honorable Melissa A. Loehr; the case was reassigned on July 18, 2022, to the Honorable John P. Colangelo; the case was again reassigned on October 3, 2022, to this Court (Patel, J.). The case is currently assigned to the Honorable Rolf Thorsen.
In approximately December 2021, Plaintiff vacated the Marital Residence and moved in with her father and stepmother, temporarily. In June 2022, she moved to a home, owned by her father, located at [REDACTED], where she currently resides and pays monthly rent of $5,200. Defendant continues to reside in the Marital Residence. On December 9, 2021, the parties entered into a second interim agreement that provided for shared physical and legal custody of the Children, and an amended access schedule now that the parties were residing in separate homes. Def. Ex. M (12/9/21 Interim Agreement) ("December 9 Interim Agreement"). The interim access schedule provides the following (generally): during week 1, Defendant shall have access time with the Children from Monday after school through Wednesday morning; Plaintiff shall have access time from Wednesday after school through Monday before school; during week 2, Defendant shall have access time from Monday after school through Wednesday morning; Plaintiff shall have access time from Wednesday after school through Friday morning; Defendant shall have access from Friday after school through Wednesday morning in accordance with week 1. 
From approximately November 30, 2021—when the December 9 Interim Agreement went into effect—through May 11, 2023, the parties adhered to the aforementioned equal access schedule (colloquially known as a 5-2-2-5 schedule). On May 11, 2023, the parties appeared before this Court on multiple issues, one of which was Plaintiff's application to suspend Defendant's overnight access with his daughter, [REDACTED], based on a series of events culminating in a handwritten letter by the child to her mother describing the strained relationship with her father and expressing her desire to reduce, if not cease, contact with her father, as well [*3]as a May 8, 2023 encounter wherein Defendant enlisted police officers to assist in exercising his access time with [REDACTED] Having heard from both parties and the AFC, the Court directed that Defendant's overnight access with [REDACTED] is suspended, that his alternate weekend access with [REDACTED] is limited to Sundays from 6:00 p.m. until 9:00 p.m., that [REDACTED] may—at her discretion—expand the access time to include midweek access with her father, and that the parties engage a family therapist to engage with Defendant and [REDACTED]. See NYSCEF Doc. No. 266 (5/11/23 So Ordered Tr.). The parties informed the Court on May 31, 2023, that they had agreed upon the engagement of [REDACTED] as a family therapist. As of at least February 13, 2024, the Court understands that [REDACTED] has elected not to exercise her discretion to spend additional time with her father. NYSCEF Doc. No. 579 at 2—3 (2/13/24 So Ordered Tr.).
Concurrent with the divorce proceeding, the parties have separate cross family petitions pending in Family Court. Defendant filed a petition on October 5, 2021; Plaintiff filed a petition on October 6, 2021. The resulting temporary orders of protection were most recently extended on April 23, 2024.
With respect to the parties' financial circumstances, Plaintiff, who was 45 years old at the time of trial, currently resides at [REDACTED]. Plaintiff is employed full-time as [REDACTED], where she has worked for seventeen years. She earned her Bachelor of Science from Cornell University and Juris Doctor from Georgetown Law School. She did not identify any health conditions or disabilities. 
Plaintiff filed an updated statement of net worth ("SNW"), her 2022 federal tax return, and 2022 New York State tax return on October 16, 2023. NYSCEF Doc. No. 437. Plaintiff's declared earnings on her 2022 W-2 are $611,816. She lists monthly expenses totaling $21,627.86, which include her share of the mortgage and carrying charges on the Marital Residence and monthly rent of $5,200; assets totaling $1,554,387, comprised of two checking accounts with a total balance of $18,721, a rental income account totaling $6,258, five savings accounts totaling $1,008, her interest in the Marital Residence, which was purchased for $1,355,000 on November 3, 2010, three retirement accounts totaling $1,359,439, a 2014 Acura titled to Plaintiff, a Tesla titled to Defendant, a life insurance policy with a cash surrender value of $47,961, a restricted stock plan with an unknown value, and 529 Plans totaling $121,000. She lists liabilities totaling $367,314, comprised of the mortgage on the Marital Residence and $50,000 owed to Jamila Hall for legal fees. Her SNW also states that she has, to date, paid her former counsel $181,184 and her current counsel a total of $283,739.
Defendant, who was 50 years old at the time of trial, currently resides in the Marital Residence. Defendant is employed full-time as an [REDACTED], where he has worked since 2020. Prior to that, he worked as a [REDACTED] from approximately 2016 through 2018. From approximately 2011 through 2016, Defendant did not work for an employer—for some period, he took classes, worked with Plaintiff's father on a business venture for an approximately 30-day period in 2012, and worked on his own business plan. Defendant earned his Bachelor of Science and Masters in Business Administration from The Wharton School. He did not identify any health conditions or disabilities. 
Defendant filed an updated SNW, as well as his 2022 federal tax return, on October 17, 2023. NYSCEF Doc. No. 441. Defendant's declared earnings on his 2022 W-2 are $313,810. [*4]He lists monthly expenses in excess of $32,830 [FN2]
; assets totaling $759,271.56 comprised of cash, six bank accounts, tenant's security deposit, and the Children's piggy banks, his interest in the Marital Residence which was purchased for $1,355,000 on November 3, 2010, retirement accounts totaling $567,305.25, a 2015 Tesla titled to Defendant, a 2019 Mercedes titled to Defendant, a life insurance policy with a cash surrender value of $47, investment accounts totaling $118,062.72, and [REDACTED] restricted awards/units totaling $49,880, of which he states that 36 unvested shares were granted prior to the date of commencement. NYSCEF Doc. No. 441 at 18. He discloses liabilities totaling $388,984, which includes the mortgage on the Marital Residence. His SNW also states that he has, to date, paid his former counsel $247,359 and his current counsel a total of $20,000.
Pre-Trial Proceedings
The parties' relationship throughout the proceeding has been hostile and antagonistic, as is evidenced by a mere cursory review of the docket, which reveals extensive motion practice, letter writing campaigns, and the need for Court intervention as to almost every issue presented in this case including, but not limited to, the payment of the monthly mortgage on the Marital Residence, interim child support, the use and admission of audio recordings, access schedule, holiday access schedule, and enrollment of the Children in therapy and extra-curricular activities.
The preliminary conference was held on November 16, 2021, before Court Attorney-Referee Irene Ratner, Esq. NYSCEF Doc. No. 28. At the time of the preliminary conference, Plaintiff was represented by The Miller Law Group and Defendant was represented by BodnarMilone LLP. Thereafter, the Court appointed Dr. Peter J. Favaro as the neutral forensic evaluator as to issues of custody/access, domestic violence, mental illness, decision-making, visitation, substance/alcohol abuse, interference with parental rights, and coercive control with respect to finances. NYSCEF Doc. No. 37 (1/21/22 Order). The Court also appointed Gloria Marchetti-Bruck, Esq. as the AFC. NYSCEF Doc. No. 36 (1/29/22 Order). Plaintiff is responsible for 60% and Defendant is responsible for 40% of the fees for both professionals. The preliminary conference order includes an addendum consisting of two temporary orders of protection from Family Court, one obtained by each party.
As described, on December 9, 2021, the parties entered into an interim agreement as to custody and access, and agreed that Defendant would enjoy exclusive use and occupancy of the Marital Residence, pendente lite, and Plaintiff would vacate the home.
On January 4, 2022, Plaintiff's counsel filed a consent to change attorney from The Miller Law Group to Sarah Hechtman, Esq., of Rower LLC. NYSCEF Doc. No. 32. On October 5, 2022, Plaintiff's counsel filed a consent to change attorney from Sarah Hechtman, Esq., of Rower LLC to Mitchell Lieberman, Esq. of Cohen Clair Lans Greifer Thorpe & Rottenstreich LLP. NYSCEF Doc. No. 67. This Court notes that Plaintiff's counsel remains the same but is now associated with a different firm, Lieberman & Lieberman, PLLC.
On May 3, 2022, Defendant's counsel filed a consent to change attorney from BodnarMilone LLP to Jennifer Jackman, Esq., of Miller Zeiderman LLP. NYSCEF Doc. No. [*5]41.
On August 22, 2022, Defendant filed an Order to Show Cause (Mot. Seq. 1) to hold Plaintiff in contempt and to suppress any evidence obtained by Plaintiff (i.e., audio recordings). NYSCEF Doc. No. 46. The Court (Colangelo, J.) declined to sign the Proposed Order "in light of the conference scheduled for September 1 at 9:30 A.M. at which these matters may be addressed." NYSCEF Doc. No. 50. 
On September 19, 2022, Defendant filed second Order to Show Cause (Mot. Seq. 2) directing Plaintiff pay child support in the amount of $7,500 per month. NYSCEF Doc. No. 53. On September 21, 2022, Defendant filed a third Order to Show Cause (Mot. Seq. 3) to suppress any evidence obtained by Plaintiff and restrain the court-appointed forensic evaluator from reviewing any recordings obtained by Plaintiff. NYSCEF Doc. No. 59. 
On October 21, 2022, Defendant's attorney, Ms. Jackman, filed an Order to Show Cause (Mot. Seq. No. 4) to withdraw as counsel for Defendant. NYSCEF Doc. No. 90. On November 2, 2022, Defendant's counsel filed a consent to change attorney from Jennifer Jackman, Esq., of Miller Zeiderman LLP to Elliot Wiener, Esq. of Phillips Nizer LLP. NYSCEF Doc. No. 97. On January 9, 2023, Defendant's attorney, Mr. Wiener, filed Order to Show Cause (Mot. Seq. No. 5) to withdraw as counsel for Defendant. NYSCEF Doc. No. 142. Said application was granted on the record on January 23, 2023. NYSCEF Doc. No. 156 (1/23/23 So Ordered Tr.). On February 7, 2023, Lydia Milone, Esq., of BodnarMilone LLP, filed a notice of appearance on behalf of Defendant.
On January 20, 2023, the Court issued a Decision and Order on Motion Sequence Numbers 2, 3, and 4, inter alia, denying Defendant's award of pendente lite child support, denying Defendant's request to suppress Plaintiff's recording of Defendant's conversation with the parties' Children on August 15, 2022, and directing Plaintiff to produce the aforementioned recording to the Court for an in-camera review. NYSCEF Doc. No. 149 (1/20/23 Decision & Order).
On March 13, 2023, the Court permitted a briefing schedule with respect to the parties' respective motions (Mot. Seq. Nos. 6, 7) as to the payment of mortgage and carrying charges associated with the Marital Residence, and set trial to commence on October 2, 2023.
On April 5, 2023, the Court rendered a decision from the bench with respect to Motion Sequence Numbers 6 and 7, regarding payments of the monthly mortgage on an interim basis pending trial. The Court directed that the parties equally share the monthly mortgage amount pending resolution, without prejudice to either party and subject to reallocation at trial. The parties were further directed to continue the status quo with respect to payment of the homeowner's insurance, homeowners' association fees, and real estate taxes. 4/5/23 Tr. at 5:25—6:6.
On April 28, 2023, Defendant's attorney, Ms. Milone, filed an Order to Show Cause (Mot. Seq. No. 8) to be relieved as counsel. NYSCEF Doc. No. 227. At a conference held on May 11, 2023, the Court granted said motion on consent and on the record, and relieved counsel from representation. NYSCEF Doc. No. 266 (5/11/23 Tr. at 7:6—13). The Court allocuted Defendant with respect to his voluntary decision to proceed pro se in this action. Id. On September 11, 2023, Jeff Klein, Esq., of Mulhern & Klein, filed a notice of appearance to represent Defendant. NYSCEF Doc. No. 359.
Note of Issue was filed by Plaintiff on July 17, 2023.
The Forensic Report
The Court appointed Dr. Peter J. Favaro as a neutral forensic evaluator on January 31, 2022. NYSCEF Doc. No. 37. The forensic report was submitted to the Court on August 31, 2022 ("Favaro Report"). The Court entered the forensic report into evidence at trial, and Defendant called the evaluator to testify at trial. Plaintiff challenged the report at trial through the testimony of its forensic consultant, [REDACTED]. While the Court accords some weight to the opinion and recommendations of the forensic report, "they are not determinative and do not usurp the judgment of the trial judge." Koslowski v. Mangialino, 36 AD3d 916, 917 (2d Dept. 2007). 
Prior to conducting interviews of the parties, Dr. Favaro emailed assignments to each party to complete a detailed account of their relationship histories and to complete additional on-line questionnaires. Dr. Favaro conducted three clinical interviews each of Plaintiff and Defendant via video conference. He conducted two clinical interviews of each of the Children via video conference, once at the mother's home and once at the father's home. The parents were advised to give the Children privacy during their interviews. According to Dr. Favaro, the mother expressed her concern that the Children would not be given privacy and that the father would pressure the Children into revealing what they said and/or the Children would feel uncomfortable expressing their feelings during the interview at their father's home. 
Dr. Favaro consulted with ten collateral sources, and reviewed voluminous documents provided by the parties. In July 2022, the parties were directed by Dr. Favaro to complete a standardized personality test. Regarding the methodology employed, Dr. Favaro states in his report that "[w]hen choosing between collecting self-report orally through face-to-face interview or in written form, [he utilizes] both but will often emphasize written responding," stating that "[w]ritten data is less subject to inaccuracies in data description." Favaro Report at 5. Dr. Favaro specifically states that he does not "regurgitate the he-said/she-said narratives of the parties in the interview section as is customary for many of my colleagues." Id. at 8. However, his report includes the parties' responses verbatim from their written questionnaires.
The Favaro Report describes Plaintiff as follows:
[REDACTED] presented as deferential and polite throughout the evaluation. Like the father she often was extremely picky and interpreted a lot of his behavior to be indicative of a person is mentally ill. [ . . . ] Like father she is often self-praising and self-righteous. She declares that she has taken over the lead for childcare in her own home. [ . . . ] She is opposed to 50/50 because 'you need two healthy parents.' When I asked how he is unhealthy she replied, 'the kids are safer with me. The reality is they are used to being cared for by me.' She continued to say things like 'I am more stable,' and 'the more time with me the better.' This made it seem like visitation with the father was a necessary evil. After suggesting that she reported 'the time sharing is not the issue.' She reported that the children need to understand that 'knowing the reality that this is the dad they have.' I follow up on the issue of why father is so 'unhealthy.' Mother reports that this case has all the characteristics of Inmate Partner Violence in the form of coercive control. [ . . . ] She provides anecdotes that reflect her position that he is controlling. She reported the kids have always liked zip lining but he withdraws consent for it. He 'unilaterally decides what kids cannot do when they are with me.' Mother avers that father flip flops on things like track. 'He bought them running shoes then would not consent to track. Choosing a therapist for their son has been a recent issue. He won't consent to a therapist with no Ph.D.' She believes he is a malicious gatekeeper who will not allow him to [*6]participate in decisions. (He thinks the same). Id. at 14—15.
The Favaro Report describes Defendant as follows:
Father was polite, respectful, and deferential at all times. He perceives himself as victimized and is highly critical of the mother. Despite this he advocates for 50/50 with a lot of influence from both parents. He does believe that he is the better decision maker and believes that mother should not have decision-making. He asserts that he was the primary parent. He claims to be 'pragmatic' and the better decision maker because 'she is impulsive and irrational. I am pragmatic and I do the work.' He claims to make 'more informed decisions.' When she does speak to him, he avers she says, 'fuck you' and hang up. He reports that the parties agree on religion. [ . . . ] Midway through the evaluation (as conflict escalated) he questioned whether 50/50 is the best option. He believed he should get more custody. He supports this in part by claiming to be the primary caregiver for 8 out of 11 years. He did have help from a nanny. At times it appeared as though he thought he knew more than me about parenting plans. 'I come from an academic family,' was his position about promoting his excellence as a sole custodian. [ . . . ] There were allegations of him being physically abusive. He denies ever hitting her but says she has hit him a number of times. Id. at 13—14.
The Favaro Report describes the co-parent dynamic as dysfunctional:
Each parent has a strong interest in presenting their superiority and being highly critical of the other parent. They each attempted to marginalize the parent by casting aspersions on the other parent's mental health [ . . . ] The children love their parents. Mother is seen by the children as 'kinder' and 'nicer.' The eldest daughter speaks to the issue of father saying mean things about mother." [ . . . ] When a child describes their parents as 'enemies,' it is certain that their toxic co-parenting is unambiguously demonstrating their hatred of one another to the children. Id. at 26—27.
Dr. Favaro concluded, based on the MMPI-3 Objective Test of Personality, that both parties' protocols are valid and unremarkable showing no indications of behavioral dysfunction.Id. at 25.
In conclusion, the Favaro Report states:
Conflict between combative custody litigants can be described along the dimensions of frequency, intensity, and duration. In this case all three metrics are present in high amounts and when that is the case a fact finding is often necessary to evaluate the credibility of the parties' concerns. A report like this hopefully offers help to the Court but does not determine factual accuracy. [ . . . ] Changing the access time does nothing to repair this. It merely substitutes one set of problems for another as resentment and control issues continue to come front and center. These parents both suffer from a dedication to their own arrogance and righteousness. This characteristic will present a barrier to positive change. Your honor might want to consider spheres of influence as a means of maintaining a balance of influence regarding the children. It is a worthwhile experiment, but I do not hold any hope for any pragmatic attempt to deal with parenting issues as something that will promote success—that can only be done by placing the needs of the children above their own." Id. at 27. The Court observes that Dr. Favaro states, in accordance with the Matrimonial Commission, "Mental health evaluators should not and do not assess credibility. The state of the science indicates that mental health evaluators are not particularly good judges of credibility." [*7]Id. at 3. 
Trial Proceedings
Both parties testified at trial. Plaintiff called the following seven witnesses at trial: [REDACTED] (father of [REDACTED]'s friend), [REDACTED] (Plaintiff's friend), [REDACTED] (forensic consultant), [REDACTED] (Plaintiff's stepmother), [REDACTED] (Plaintiff's father), [REDACTED] (Defendant's sister-in-law), and [REDACTED] (Plaintiff's mother). Defendant called two witnesses: Dr. Peter Favaro (neutral forensic evaluator) and [REDACTED] (real estate appraiser). Upon consent of all parties and counsel, the Court bifurcated the custody and financial portions of the trial but heard both portions consecutively.
Background
On November 8, 2023, the Court rendered a decision on the record with respect to a motion in limine filed by Plaintiff regarding [REDACTED]'s report. The Court granted Plaintiff's motion to preclude the report as well as [REDACTED]'s testimony at trial, in part because [REDACTED] was [REDACTED]'s then-treating therapist and [REDACTED] did not waive confidentiality of her records. Tr. at 713:14—716:17.
Plaintiff testified that she grew up in Westchester County and, following her parents' divorce, resided with her biological mother in [REDACTED] during elementary and middle school then with her father and stepmother in [REDACTED] for high school. Plaintiff described her relationship with her parents and her stepmother as loving and supportive. Plaintiff also has a half-brother and half-sister, both of whom she is close with. Tr. at 839:2—844:10. [REDACTED], Defendant's sister-in-law, described Plaintiff as a "loving but firm mother" who brings "structure and warmth" to her kids as well as an overall "terrific mother." Tr. at 866:10—13.
Defendant testified that he was born in Nigeria and is one of three children. Tr. at 54:17. He was raised Christian, despite the fact that his mother was "ethnically Jewish," but did not practice. Tr. at 55:1—8. He came to the United States when he was twelve years old when his parents separated. His father and two siblings returned to Nigeria, but Defendant stayed in the United States with his mother and attended boarding school in Massachusetts. Tr. at 56:1—19. He testified that he is estranged from his siblings and has not seen them in a number of years. Tr. at 61:5—9.
Plaintiff testified that the parties met in 2005, dated for the summer, then broke up. Tr. at 897:8—11. They resumed dating in 2008, and got married in November 2010. Tr. at 59:1—7. 
Plaintiff testified that Defendant, although employed at the time the parties started dating, was unemployed for a period of approximately six years throughout the marriage. Plaintiff testified that the parties' understanding when they married was that they would be a two-income family and would employ full-time childcare. Tr. at 902:12—20. In 2012, Defendant helped his father-in-law with his business for approximately thirty days, but was not employed again until 2016, when he started working for [REDACTED]. Tr. at 193:10—19. Defendant testified that prior to 2016, he was self-employed "working on the idea of a start-up" business. Tr. at 193:21—24; 194:23—24. In 2018, Defendant was again unemployed for a period of approximately 18 months. Tr. at 196:9—21. Plaintiff testified that throughout the marriage when the parties discussed Defendant's reasons for unemployment, Defendant indicated that positions he interviewed for were not good enough or not interesting to him. Tr. at 902:2—11. Plaintiff remained employed at the same company throughout the marriage. Tr. at 197:1—18. Plaintiff testified that she relied on the nanny, her mother, father, and stepmother to help care for the [*8]Children, including during the extensive periods when Defendant was unemployed, and when Plaintiff traveled for business.
Parenting Style
Plaintiff testified that her "concerns with [Defendant's] parenting style happened fairly early on, even from when the kids were little," specifically that "his reactions to the children were extremely intense and loud and scary." Tr. at 925:4—11. Plaintiff testified that although Defendant's behavior improved slightly when he was employed with [REDACTED], it deteriorated in early 2019, after Defendant was let go from the company. Tr. at 926:2—11. For example, Plaintiff testified that "if the children did not complete an assignment or if they were caught doing something that he might have told them not to do previously" his reaction was "extremely disproportionate to the actual incident and appeared to be volcanic, appeared to be irate." Tr. at 926:17—22. According to Plaintiff, Defendant would say things to the Children such as, "you're so stupid, I told you not to do this already," "use your brains, you're not doing what you're supposed to," and "you're lazy." Tr. at 926:23—927:4. Plaintiff testified that in 2019, their relationship "really escalated and deteriorated" when Defendant hit Plaintiff for the first time by punching her in the back with a closed fist, leaving a large bruise, and his "verbal accusations continued to increase and get more severe." Tr. at 927:21—24; 928:2—24; 929:4—9. In 2019, Plaintiff sought domestic violence services at the [REDACTED] YWCA.
Plaintiff's friend, [REDACTED], testified that she has observed Plaintiff disciplining her children in a firm tone; Plaintiff would raise her voice for effect, but would never resort to name-calling or disparaging language. Tr. at 366:15—367:7. [REDACTED] further testified that Plaintiff hung up the Children's artwork in the kitchen, praised the Children, and wanted to help further their interests. Tr. at 367:12—24. [REDACTED] described Plaintiff's maternal instincts as strong, determined, caring, and loving while teaching important values such as accountability and respect. Tr. at 368:10—369:4.
Plaintiff's stepmother, [REDACTED], testified that Plaintiff is interested in each of the Children's emotions and their well-being. Tr. at 745:4—11. She described an argument she witnessed between the parties in 2019, wherein Defendant was screaming and yelling that Plaintiff's father was an "idiot" and an "asshole." Tr. at 746:15—25. About two weeks later, [REDACTED] was informed by Plaintiff that Defendant wanted Plaintiff's parents to "take a break" from seeing the Children. Tr. at 747:3—9. In May of 2021, Plaintiff's parents were again prohibited from seeing the Children because Defendant was admitted to the hospital following a bicycle accident and was upset that Plaintiff's father and stepmother did not call him while he was in the hospital, and during which time Plaintiff's stepmother was assisting with childcare. Tr. at 10—25. Plaintiff's father, [REDACTED], testified that since Plaintiff moved out of the Marital Residence, he has had no issues seeing the Children. Tr. at 835:13—21.
[REDACTED] has an order of protection against Defendant because, in 2021, after the commencement of the instant action, Defendant came to the house and started banging on the door and yelling for the Children to come down. Defendant told [REDACTED] that he was going to have her arrested for kidnapping and holding the Children hostage. Tr. at 749:16—750:13.
Defendant testified as to his routine during his access time with the Children, and how they spend time together. He testified that he takes care of each of their individual needs, and [*9]they eat meals together as a family. During the weekends, he stated that he enjoys riding bikes with the Children, playing activities such basketball and street hockey, and going to Life Time gym, which offers children's activities such as a rock climbing and pickle ball. Tr. at 1507:21—1512:13. Defendant submitted video recordings of the Children riding bikes, boating, and doing a science experiment with Defendant. Def. Ex. R (Audio of defendant and children engaging in science project/biking/rafting). He further testified that he maintains a relationship with family members on his mother's side in [REDACTED] and [REDACTED], as well as cousins on his father's side in [REDACTED]. Tr. at 1513:10—19.
When asked to describe his parenting during other incidents, such as when Defendant discovered [REDACTED] cheating on a Kumon workbook, Defendant distinguished the incident by stating, "those were [[REDACTED]'s] actions and part what I wanted to impute as a parent is responsibility for what you do being honest . . . what [[REDACTED]] had done was he had cheated, and he had lied about it. Part of what I wanted to do as a parent was to hold each child responsible for what they do, teach them that those kinds of actions aren't appropriate." Tr. at 644:10—645:5. 
August 2022 Visit to Defendant's Family
There was extensive testimony regarding an incident between Defendant and the Children after Plaintiff took the Children to visit Defendant's brother, [REDACTED] (husband of [REDACTED]), and his family at their home in August of 2022. Prior to this visit, Plaintiff had taken the Children to visit [REDACTED] and [REDACTED], and their children, in April and July 2022. The parties and [REDACTED] testified that the relationship between [REDACTED] and Defendant broke down in 2009, and has been strained ever since, although the families would see each other one or two times per year. Tr. at 857:5—858:15. Following the April 2022 visit, Defendant sent an email to [REDACTED] stating, in part,
I do not appreciate you having my children to your house without informing me . . . [REDACTED] there is a reason I do not speak to you anymore and did not invite you to my wedding and this only reinforces it. Do not involve my children to try to score points. You are truly a pathetic person but I wouldn't have thought even you would stoop to something this low. Pl. Ex. 34o (4/11/22 Email).
Following the August 2022 visit, Plaintiff recorded the incident whereby Defendant questioned the Children, who were at the mother's home, about the visit during a FaceTime call. Defendant stated that he did not want the Children around his brother because he had physically abused his wife, [REDACTED]. Pl. Exs. 7a (8/15/22 recording); 7b (8/15/22 recording Tr.); Tr. at 84:17—21 ("My brother is a bad person. He choked and dragged his wife, just how momma hit poppa."). Defendant instructed the Children that if their mother attempted to take them to Defendant's brother's house, they should not get into the car. Tr. at 70:15—18. He told the Children "I don't care what momma says," "You don't have to listen to momma anymore," and "Don't worry, I'm going to deal with mom in court, but you know what, you guys better, excuse me, fucking listen to me. You understand me?" Tr. at 80:19—81:25. This audio call between Defendant and the Children lasted for twenty-seven minutes and ended with Defendant threatening to prevent the Children from attending any activities, and telling the Children that they were also not allowed to visit Plaintiff's family. Id. at 83:6—84:9; 85:17—20. Defendant testified that this incident represents a "parent fail." Tr. at 92:5—14.
With respect to the incident that Defendant refers to where his brother "choked and [*10]dragged his wife," [REDACTED] testified that the incident incurred in 2006, before the parties were married in 2007. Tr. at 855:3—19. She testified that her husband went into counseling after the incident occurred and that this "was the only occasion in which he pulled [her] or touched [her] or engaged in any physical non-consensual contact with [her]." Tr. at 875:16—19.
Halloween 2021
The parties and [REDACTED] testified as to an incident on October 31, 2021 (Halloween), when the parties hosted the Children and some of their friends at the Marital Residence and surrounding neighborhood for trick-or-treating. The parties began fighting. The altercation escalated, and Plaintiff called the police. Tr. at 260:5—11. [REDACTED] testified that he went to pick up his daughter at the parties' house after receiving a frantic call from his wife. When he arrived, [REDACTED] and two of her friends, including [REDACTED]'s daughter, were standing outside on the sidewalk and there were police cars lined up in front of the house and his daughter was visibly upset. He left the home with both his daughter and [REDACTED] in the car, and testified that both girls were silent during the car ride. Tr. at 338:21—342:21. [REDACTED] further testified that he would not permit his daughter to visit [REDACTED] at Defendant's home because the "environment in his house and him in particular is not something that we would ever let [our daughter] be exposed to knowingly." Tr. at 353:13—15.
Decisions Regarding Children's Education
Defendant testified that he is focused on enriching the Children's academics through the use of workbooks and academic programs such as Kumon and Beestar. See Def. Ex. S (Picture of work books). Defendant testified that he first introduced Kumon to [REDACTED] to supplement her math, even though he acknowledged that she was not struggling with math at the time. Tr. at 109:21—110:4. Defendant admitted that he has told the Children there would be consequences if they failed to complete their Kumon studies. Tr. at 112:19—25.
Plaintiff testified that on April 21, 2021, she recorded an incident involving Defendant and [REDACTED] with respect to [REDACTED]'s completion of a Kumon workbook. Pl. Ex. 38a (4/21/21 audio recording). Plaintiff testified that she heard [REDACTED] apologizing to Defendant and Defendant called [REDACTED] "stupid and a liar and a cheater" and then she saw Defendant smack [REDACTED] in the face twice and yell at [REDACTED]. When Plaintiff attempted to intervene, Defendant started screaming at her telling her to get out. Tr. at 934:2—18. When Defendant refused to leave the room, Plaintiff placed herself between [REDACTED] and Defendant. During the incident Defendant called the other children in, who were not present up until that point, and told them that [REDACTED] had cheated or copied answers from the back of the workbook and Defendant began comparing the siblings and their work ethic. Tr. at 937:9—18. This incident lasted about one and a half hours, according to Plaintiff. 
Defendant testified that he believed during the "bulk" of the parties' marriage, Plaintiff was not doing enough of the homework with the Children. Tr. at 193:4—9; 197:13—17. Plaintiff submitted a video recording from December 17, 2019, in which Defendant wakes up the Children and questions the Children about Plaintiff not doing homework with them. Pl. Ex. 43a (12/17/19 video recording). Defendant admitted that bringing the Children into the argument at [*11]10:00 P.M. was not in their best interest. Tr. at 203:24—204:4.
[REDACTED]'s Ear Piercing
Defendant testified as to an incident between himself and [REDACTED] regarding [REDACTED] getting her ears pierced. Defendant testified that he did not agree that [REDACTED] should have her ears pierced for a second time, after she experienced an infection the first time. Tr. At 205:8—206:12. Plaintiff informed him that [REDACTED] got her ears pierced; he instructed Plaintiff to remove the earrings. Thereafter, [REDACTED] arrived at Defendant's home for her scheduled access time. When she arrived, he tried to remove the earrings by unscrewing them. When he was unsuccessful, he used a wire cutter to remove them from her ears. Tr. at 209:3—210:10. Defendant testified that he does not believe that this incident and his actions "had any impact on her self-esteem." Tr. at 210:13—14. Defendant maintains that he removed the earrings because he was concerned about [REDACTED]'s health, although he testified that he did not consult a medical professional, such a dermatologist, about the earrings and/or their removal. Tr. at 206:17—207:6. 
[REDACTED]'s Friend's Bat Mitzvah
The parties and [REDACTED] testified regarding an incident involving the Bat Mitzvah of [REDACTED]'s daughter, who was identified as one of [REDACTED]'s best friends, on April 29, 2023. The [REDACTED] family invited [REDACTED] and Plaintiff to the ceremony and reception. Plaintiff responded to the formal invitation stating that Plaintiff and [REDACTED] would attend. Defendant testified that the event fell on his scheduled weekend, and he would permit [REDACTED] to attend either the ceremony or reception, but not both because "9 hours is too much time, yes, because there are things we want to do with her siblings." Tr. at 236:22—24. [REDACTED] testified that the Thursday prior to the Saturday event, Plaintiff texted [REDACTED] stating that [REDACTED] would only be permitted to attend either the ceremony or the reception. Tr. at 331:13—332:9. His daughter was upset, but everyone agreed that [REDACTED] should attend the reception, if forced to choose. 
Defendant testified that on the morning of the event, he had questioned [REDACTED] regarding her homework and discovered that it was not completed. Because [REDACTED] lied to Defendant about completing her homework, she was not permitted to attend the event, hours before her expected arrival. Tr. at 539:1—543:6. Defendant testified that he messaged Plaintiff via Our Family Wizard on the morning (at 11:19 a.m.) of the event that [REDACTED] would not attend because she "has a lot of schoolwork that she hasn't been doing. She also has been untruthful and as I told you if she keeps doing that, she doesn't get to do things." Pl. Ex. 35d (4/27-4/29/23 OFW Messages). Upon learning that [REDACTED] would not attend the reception, [REDACTED] attempted to call and text Defendant, but he did not pick up the phone and responded by text, "[REDACTED] — I regret that [[REDACTED]] can't come but I have set clear expectations with her." Pl. Ex. 35a. [REDACTED] testified that his daughter was "extremely upset." Tr. at 336:3—20. In fact, [REDACTED] offered to pick up [REDACTED] and drop her back to Defendant so that she could attend even for a short time. Thereafter, Defendant took the three children to play at Life Time gym as per his original plans. 
[*12]Decisions Regarding Children's Health
Defendant testified that [REDACTED] developed gastrointestinal issues at age two. Defendant believed that the issues were attributed to a food intolerance or berry allergy. Following a negative berry allergy test, Defendant then believed that [REDACTED] had a kiwi allergy. After two different allergists determined that [REDACTED] did not have an allergy, [REDACTED]'s doctor referred the parties to a gastrointestinal psychologist based on the belief and medical diagnoses that the issues were attributed to stress and anxiety. Defendant testified that he did not consent to [REDACTED] seeing a gastrointestinal psychologist because (1) the sessions were not in person; (2) [REDACTED] was already seeing a therapist, and (3) Benadryl was more effective than Dimetapp for [REDACTED]'s stomach issues. Tr. at 320:17—323:10; 513:1—520:10; 939:21—961:23; 1165:15—1192:23; 1523:12—1524:7. Defendant also told the allergist that she was not educated enough to opine on the issue, and offered to provide her with his own research. Tr. 314:25—315:14.
In a separate incident, on August 6, 2022, the parties attended a myofascial therapy appointment for [REDACTED]. The therapy appointment was during Defendant's access time, but Plaintiff provided 24 hours' notice to Defendant that she would attend. Tr. 286:25—287:7. During that appointment, which was recorded and during which [REDACTED] was present, Defendant threatened and demeaned Plaintiff. Pl. Ex. 44a (8/6/22 audio recording). Specifically, Defendant told Plaintiff that if she was not quiet, Defendant would tell the doctor that he or she could not treat [REDACTED] without Defendant's consent. Tr. at 283:2—12. He then told Plaintiff that he could make her leave the appointment. Tr. at 21—23. In the presence of the therapist and [REDACTED], Defendant repeatedly told Plaintiff to be quiet or leave; he told her to "get out." Tr. at 284:21—25. Defendant informed the therapist of the parties' pending divorce, and accused Plaintiff of showing up unannounced and making the situation "toxic." Tr. at 291:15—293:10. The therapist ultimately told the parties that she would terminate the visit. Later that day, the therapist called Plaintiff to check on her well-being because of Defendant's behavior during the appointment. Pl. Ex. 44b (Voicemail Message from [REDACTED] to Plaintiff from on or about August 6, 2022) .
In October 2023, a few weeks before trial, [REDACTED] testified that she was caring for the Children while Plaintiff was away on business, and [REDACTED] came downstairs crying and visibly upset. [REDACTED] was experiencing stomach issues and [REDACTED] gave him Dimetapp. Defendant then showed up at the house in the evening; [REDACTED] went across the street to meet Defendant who had parked his car. [REDACTED] came back into the house with a bottle of Benadryl and asked [REDACTED] to give him said medicine based upon his father's direction. She did not administer the Benadryl because she had already administered Dimetapp.
In 2023, after [REDACTED] had been in therapy with [REDACTED] for approximately one year, Defendant took issue with [REDACTED], who indicated that [REDACTED] had violent tendencies, which, according to Defendant, "is usually a trope that is used for black boys." Tr. at 481:6—9. Defendant notified Plaintiff that "[REDACTED], as a white man who grew up under apartheid in South Africa, is definitely the wrong person to see our six-year-old African American son" and advised Plaintiff that he no longer consented to [REDACTED] seeing [REDACTED]. Tr. at 482:24—484:21. Defendant admitted that he knew [REDACTED]'s background when he selected him as a therapist for [REDACTED]. Tr. at 480:21—23.
In May 2023, the parties agreed that [REDACTED] and Defendant would attend family therapy sessions with [REDACTED]. [REDACTED] objected to joint sessions and the parties engaged in separate sessions with [REDACTED] for a number of months. Nevertheless, [REDACTED] conducted two joint sessions with [REDACTED] and Defendant shortly before trial. Contrary to the Court's directives, [REDACTED] issued a report at Defendant's request and Defendant issued a CPLR § 3101(d) notice prior to trial. As referenced supra, the therapy sessions and report that followed, became the subject of Plaintiff's motion in limine. On behalf of [REDACTED], the AFC argued that [REDACTED] should not be called as a fact witness or an expert witness at trial. Tr. at 17:2—7.
Decisions Regarding Children's Religious Upbringing
Plaintiff testified that she does not choose to raise the Children in any one particular faith, and that she believes the Children should be exposed to different beliefs and practices. Tr. at 990:14—994:16. By contrast, and contrary to what he reported previously to Dr. Favaro, Defendant testified that the parties have raised their Children as Christians, as evidenced by the presence of bibles in the Marital Residence, from which Defendant testified that he has read to the Children. Tr. at 1515:2—1518:4. Defendant admitted that the family did not join a church, attend religious services, and that religion was not an area of disagreement during their marriage. Tr. at 1519:7—1520:16.
Decisions Regarding Children's Extra-Curricular Activities
Plaintiff maintains that Defendant has arbitrarily withheld his consent for each of the Children to participate in certain activities, and frequently threatens legal action when the parties approach a disagreement. For example, Defendant objected to (1) [REDACTED] participating in dance; (2) [REDACTED] and [REDACTED] participating in track, after purchasing track shoes for [REDACTED] and [REDACTED]; (3) [REDACTED] participating in a trip with her Girl Scouts troop; (4) the Children attending summer camp; and (5) [REDACTED] participating in lacrosse. Tr. at 433:20—447:1; Pl. Ex. 34e; 34g; 34i; 34j.
Lincoln Hearing
The Court directed a Lincoln hearing to corroborate information presented at the hearing and to ascertain the desires of the Children. The decision to conduct a Lincoln hearing to determine the best interests of the child in a custody dispute is within the discretion of the trial court. See Matter of Desroches v. Desroches, 54 AD3d 1035, 1036, 864 N.Y.S.2d 551, 553 (2d Dept. 2008). At the opening of trial proceedings, the parties and the AFC requested that the Court conduct a Lincoln hearing. Given the request of the parties and the AFC, the ages of the Children (ages 12, 10, and 8), the representations of the AFC, and the Court's determination that a Lincoln hearing would offer material value to the proof that has been presented at the hearing, the Court held a Lincoln Hearing with each of the Children on November 9, 2023. The Court may not disclose information shared by a child during a Lincoln hearing in order to protect the Children from having to openly choose between parents or divulge intimate details of their respective parent/child relationships. See Matter of Lincoln v. Lincoln, 24 NY2d 270, 272—273 (1969).
During the Lincoln Hearing, each of the Children testified separately, and were [*13]represented by the AFC. The general nature of the topics covered include, but were not limited to: interests, hobbies, extra-curricular activities, relationship with each parent, relationship with each sibling, and the access schedule. All three Children were of sufficient age and intelligence at the time they provided testimony, and clearly and consistently articulated their positions to the Court. They honestly expressed their feelings, experiences, and wishes. This Court finds that the Children's testimony is reliable and of evidentiary value, and considers their testimony in resolving custody and access. 
Post-Trial Submissions
Plaintiff Wife
Plaintiff argues that joint legal custody is not appropriate because the parents cannot effectively communicate with each other as to major issues concerning the Children, and accordingly, the Court should award Plaintiff sole legal custody of the Children. Plaintiff states that she was the Children's primary caretaker during the marriage and that "Defendant's method of raising the children is to create an environment of fear and consequences where punishment is meted out in a disproportionate fashion." NYSCEF Doc. No. 558 (Pl. Post-Tr. Sub.) at 3. She states that "Defendant is abusive and dismissive of Plaintiff, arbitrarily withholding his consent regarding major decisions at the expense of the children" and "Defendant possesses a keen unwillingness to compromise on nearly every issue concerning the children." Id.
She alleges that Defendant's tone and language directed at the Children was "abhorrent and abusive, designed to inflict as much emotional harm as possible," and that "Defendant routinely embroiled the children in his rants against Plaintiff, using them as 'witnesses' to prove whatever point he was trying to make." Id. at 13. Plaintiff further alleges that "Defendant has torpedoed nearly all his familial relationships as well as those with his in-laws." Id. at 18.
Plaintiff alleges that Defendant was "unable to productively discuss and agree with Plaintiff on nearly every major medical issue [ . . . ] concerning the children." Id. at 4. Plaintiff directs the Court to testimony and evidence presented throughout the trial that demonstrate Defendant's repeated pattern of putting his own beliefs before the health and welfare of the Children.
Plaintiff further alleges that the trial testimony and evidence demonstrate Defendant's pattern of abuse not only towards Plaintiff, but also towards the Children "when he feels that they are not meeting his educational standards." Id. at 7. With respect to extra-curricular activities, Plaintiff alleges that Defendant's behavior demonstrates a pattern of withholding or revoking his consent as a form of exercising leverage and not because his actions are in the best interests of the Children.
Plaintiff argues that Defendant did not raise the issue of religion until the time of trial, and that religion was never a focus nor an issue during the marriage, as was demonstrated by Defendant's testimony that the Children were not enrolled in religious training and did not attend religious services. Id. at 10.
Plaintiff argues that Defendant's access should be limited, pointing out that the Court limited Defendant's access time with [REDACTED] during the litigation, after the child reported abuse to the AFC and Plaintiff. Plaintiff is concerned that equal access with the parties with respect to the [REDACTED] and [REDACTED] will permit Defendant to further harm the boys in the same manner as [REDACTED]. Plaintiff asks the Court to limit Defendant's access to alternating weekends and one midweek dinner with the boys and maintains that it is in [*14][REDACTED]'s best interest to continue the current access schedule with Defendant, permitting only dinner access on alternating Sundays with any expanded access left to [REDACTED]'s discretion. This Court refers to NYSCEF Doc. No. 559 (Pl. Post-Tr. Sub.) at Ex. 1 for a full recitation of Plaintiff's proposed access and holiday schedule. 
Plaintiff asserts that the Court should disregard the Favaro Report and testimony because, inter alia, his report was inadequate and unreliable, he failed to cite to any peer reviewed literature, and the majority of the data was obtained through written questionnaire as opposed to in-person interviews.
With respect to finances, Plaintiff argues that the Court should award her the entirety of her restricted stock units and retirement accounts acquired during the course of the marriage. "The condition of vesting of the subject RSUs was that Plaintiff remain employed until the vesting date. The period of employment required for Plaintiff to have the RSUs vest expanded both before and after the commencement of the action. The documents supporting the stock plan clearly establish the same as an incentive-based program since to secure vesting and ultimate payment of the award the employee must be continuously employed from the date of the grant through the date of vesting." NYSCEF Doc. No. 558 at 29. Plaintiff alleges that Defendant's contention that he is entitled to receive half of the value of the shares of stock once vested, is contrary to the holding in DeJesus v. DeJesus, 90 NY2d 643 (1997), which held that only a portion of the husband's stock options acquired before the marriage were considered marital property.
Plaintiff argues that her RSUs vested during the instant action and that Plaintiff was required to continue her employment, including post-commencement, for the grants to vest. Furthermore, Defendant's conduct during the marriage did not enhance Plaintiff's employment or employment opportunities.
Plaintiff further avers that Defendant wastefully dissipated significant marital assets during the marriage in that he: (1) refused gainful employment; (2) drained the parties' finances; and (3) failed to contribute on a non-monetary basis such as by providing care for the Children.
Plaintiff argues that the Court should direct the immediate sale of the Marital Residence because Defendant failed to establish at trial that he has the financial wherewithal to buyout Plaintiff's equity interest in the home and/or secure a mortgage on the home.
Defendant Husband
Defendant urges the Court to continue the parties' access schedule as to [REDACTED] and [REDACTED], and further alleges that "the Court's reduction of his access time with [REDACTED] has been too draconian and/or too reliant on the wishes that [REDACTED] has expressed." NYSCEF Doc. No. 564 (Def. Post-Tr. Sub.) at 6. Defendant requests that 50/50 access be restored with [REDACTED], despite having testified at trial that he is no longer seeking 50/50 access time with his daughter. Tr. at 665:4—10. This Court refers to NYSCEF Doc. No. 565 (Def. Post-Tr. Sub.) at Ex. A for a full recitation of his requested holiday and recess schedule. 
Defendant requests joint legal custody, with the appointment of a parent coordinator, with final decision-making regarding education to Defendant and final decision-making regarding medical issues to Plaintiff. Defendant further requests that each parent select one activity per season per child, and that the Children are raised as Christians. Defendant contends that the parties have in fact been able to resolve major issues together. However, this Court notes that Defendant merely lists four examples, three of which are academic course selections [*15]for [REDACTED]. NYSCEF Doc. No. 564 at 18—20.
With respect to credibility, Defendant alleges that Plaintiff's testimony was "more exaggerated, more distorted and less truthful" than Defendant's testimony. Id. at 13. Defendant alleges that his testimony was more credible than Plaintiff's, "putting aside considerations of defendant's 'style' of testifying." Id. 
Defendant alleges that Plaintiff exercises "impaired judgement" when it comes to parenting, referring primarily to recording the Children as an example. Id. at 14. Defendant refers to many of Plaintiff's actions, such as having [REDACTED]'s ears pierced and attending the myofascial appointment, as "calculated" to provoke Defendant, thereby portraying himself as the victim. 
Defendant alleges that were the Court to continue with the current access schedule (50/50 access for [REDACTED] and [REDACTED] and less than 50/50 access for [REDACTED]), Plaintiff would owe Defendant $637 per week in child support, plus pro rata add-ons. Id. at 23. Defendant further requests various reimbursements for the Children's expenses and overpayment of the mortgage and real estate taxes. Id. at 24—25.
Defendant further requests, inter alia, that the parties' deferred compensation and retirement accounts be equally distributed. Further, Defendant wishes to buy Plaintiff out of her interest in the Marital Residence and calculates that Plaintiff's buyout entitlement would be $233,790.45, which is less a 6% broker's commission as well as Defendant's 50% portion of $28,000 in repairs funded by Defendant post-commencement.
Attorney for the Children
The AFC argues that "decision-making involving the children was a very big source of conflict and friction between the parties and that the conflict spills over and effects the children." NYSCEF Doc. No. 570 (AFC Post-Tr. Sub.) at 7. The AFC requests that the parties continue with 50/50 access for [REDACTED] and [REDACTED] as well as Defendant's current access schedule with [REDACTED]. The AFC submits that Plaintiff should be granted primary physical custody of [REDACTED] and the parties share joint physical custody for [REDACTED] and [REDACTED].
The AFC requests that Plaintiff shall have final decision-making, while providing Defendant with information and consultation, arguing that "the mother's positions, as it relates to decisions involving the children, have been appropriate and empathetic [and] more consistent with and considerate of the children's preferences and needs . . . ." Id. at 30. The AFC states that "the father's positions appeared more arbitrary and at times guided by challenging the mother." Id. 
Legal Analysis: Grounds, Custody, and Access
Grounds for Divorce
In the verified complaint, Plaintiff alleges an irretrievable breakdown of the marriage for a period in excess of six months prior to commencement of the action, see DRL § 170(7), as the sole ground for the divorce. In the verified answer with counterclaim, Defendant likewise alleges an irretrievable breakdown of the marriage for a period of at least six months. The parties are not in dispute as to the grounds for divorce and both testified credibly at trial that the marital relationship has broken down irretrievably since at least October 2021. Accordingly, the Court grants the parties a divorce on the ground set forth in DRL § 170(7).
Custody
"In any child custody dispute, the court's paramount concern is to determine, under the totality of the circumstances, what is in the best interests of the child." Matter of Olea v. Diaz, 194 AD3d 721, 722 (2d Dept. 2021); see Eschbach v. Eschbach, 56 NY2d 167, 171 (3d Dept. 1982). There is "no prima facie right to custody of the child in either parent." DRL § 70[a]; DRL § 240 [1][a]. Factors to be considered include, inter alia, "(1) which alternative will best promote stability; (2) the available home environments; (3) the past performance of each parent; (4) each parent's relative fitness, including his or her ability to guide the child, provide for the child's overall well-being, and foster the child's relationship with the noncustodial parent; and (5) the child's desires." Matter of Montebello v. Montebello, 184 AD3d 565, 566 (2d Dept. 2020) (internal quotation marks omitted); see Matter of Olea, 194 AD3d at 722. Importantly, the parent's ability to place the children's needs above his or her own in fostering a continued relationship with the non-custodial parent is an appropriate consideration. Lohmiller v. Lohmiller, 140 AD2d 497 (2d Dept. 1998); see also Janecka v. Franklin, 150 AD2d 755, 756 (2d Dept. 1989) ("mother's "unbridled" anger and hostility toward the defendant . . . would substantially interfere with her ability to place the needs of the children before her own in fostering a continued relationship with the noncustodial parent"). 
Joint custody is encouraged "as a voluntary alternative for relatively stable, amicable parents behaving in mature civilized fashion." Braiman v. Braiman, 44 NY2d 584, 589—590 (1978); see Matter of Hreat v. Hreat, 189 AD3d 1237, 1238 (2d Dept. 2020). However, joint custody is inappropriate where "the parties are antagonistic towards each other, do not communicate at all, and have demonstrated an inability to cooperate on matters concerning the child." Matter of Connell-Charleus v. Charleus, 192 AD3d 890, 891 (2d Dept. 2021); see also Lee v. Fitts, 147 AD3d 1058 (2d Dept. 2017); O'Connell v. McDermott, 80 AD3d 701, 702 (2d Dept. 2011); Matter of Laura A.K. v. Timothy M., 204 AD2d 325, 326 (2d Dept. 1994). 
The weight to be afforded to each of the various factors is within the discretion of the trial court and requires an evaluation of testimony, character, and sincerity of all the parties involved. See Bourne v. Birstow, 66 AD3d 621, 622 (2d Dept. 2009). "Inasmuch as custody determinations depend to a great extent upon an assessment of the character and credibility of the parties and witnesses, deference is accorded to the hearing court's findings in this regard," R.K. v R.G., 169 AD3d 892, 894 (2d Dept. 2019), and "[t]he court's findings will not be disturbed unless they lack a sound and substantial basis in the record." Id. at 894; see Eschbach, 56 NY2d at 173—174. The trial court's assessment of the credibility of witnesses and evidence is afforded great weight on appeal. See Alper v. Alper, 77 AD3d 694 (2d Dept. 2010).
Credibility
Both parties offered testimony at trial and were subject to direct and cross-examination by counsel. Plaintiff answered each question succinctly and clearly. Her answers are consistent with the documentary and testimonial evidence offered at trial. She demonstrated a self-possessed, cooperative, and respectful demeanor. On a few occasions, she appeared anxious but, upon being re-directed by counsel, she resumed testimony—the cadence of which was smooth and unencumbered. The Court finds Plaintiff to be credible and sincere, and her answers to be reliable. 
Defendant argues, in his post-trial submission, that Plaintiff's testimony reveals that she has a "clear agenda," and attempted to distort the facts in advance of the litigation. NYSCEF [*16]Doc. No. 564 at 11—12. Defendant accuses Plaintiff of being untruthful about statements made by Defendant and his actions—including striking their child, [REDACTED]. The Court finds Defendant's purported examples of untruthfulness to be a red herring. For example, Defendant argues that Plaintiff distorts his position as to the Children participating in certain extra-curricular activities as arbitrary when "the truth was that there was a rational basis for defendant to have objected." Id. at 11. Whether or not the basis is "rational" is a determination for the trial court based on the evidence offered at trial. Defendant takes issue with Plaintiff's testimony as to which year he started employment at [REDACTED], where there is no evidence that Plaintiff intended to mislead the Court about a fact that is otherwise substantiated by documentary evidence. Defendant takes issue with Plaintiff's testimony about his efforts to launch a business—Defendant cites to no evidence that calls into question the veracity of Plaintiff's testimony. The mere observation that Plaintiff did not remember the specific details of filing certain LLC paperwork in January 2016—almost seven years prior—does not suggest that Plaintiff was untruthful in her testimony. 
Defendant accuses Plaintiff of having "downright lied" that Defendant struck [REDACTED] in the face on two occasions, when she later testified that he smacked [REDACTED] on the head; her counsel subsequently asked questions to establish the difference between the face and top of the head. The Court notes that Plaintiff reported in her written questionnaire to Dr. Favaro about the same April 2021 incident that "[Defendant] smacked [[REDACTED]] on top of his head twice." Favaro Report at 44. Despite Defendant's efforts to brand Plaintiff as a liar, the Court did not find Plaintiff to be untruthful and/or intending to mislead the Court in her recollection and characterizations of events. Further, it is the fact that Plaintiff testified that Defendant physically hit the child that is of consequence to the Court. 
Finally, the Court finds Defendant's request that the "Court should not permit Plaintiff's softer demeanor to obscure the fact that her testimony was more exaggerated, more distorted, and less truthful than was defendant's testimony," as wholly unwarranted. NYSCEF Doc. No. 564 at 13. Indeed, Plaintiff's demeanor was anything but "soft," she was cooperative, firm, and concise. 
Defendant's testimony on both direct and cross-examination proved challenging, and the Court observes that Defendant was largely uncooperative throughout these proceedings. The Court frequently admonished Defendant and directed him to answer the questions posed to him; the Court also directed his counsel to advise him as to the appropriate manner of providing sworn testimony at trial. See, e.g., Tr. at 66:11—16; 77:20—21; 203:16—23; 685:9—18; 2178:3—6; 2258:4—9. Often, the Court was forced to break from proceedings during Defendant's testimony to afford his counsel the opportunity to advise his client. See, e.g., Tr. at 76:5—9; 179:13—15; 2053:14—16.
Defendant's lack of cooperation in the trial proceedings and repeated failures to comply with the directives of the Court rose to the level of criminal contempt, upon the Court becoming aware that Defendant, in violation of the Court's directives and the Children's Bill of Rights, had engaged with his oldest child, [REDACTED], as to the issues of custody and access, amid his ongoing testimony on Plaintiff's case, which spanned four days. The Court refers to its admonitions and finding of criminal contempt as placed on the record in open court. See Tr. at 411:24—432:25; see NYSCEF Doc. Nos. 555 (12/19/23 So Ordered Tr.); 523 (12/19/23 Short Form Order).
Defendant argues that the Court must not confuse his obstructiveness or lack of [*17]cooperation with untruthfulness, and that despite Defendant's "style" of testifying, his credibility is "greater" than Plaintiff's. There are three flaws to Defendant's position. First, in failing to directly answer questions on both direct and cross-examination, the Court reasonably concludes that Defendant's non-responsive answers undermine his credibility. See Torres v. Cortes, 206 AD3d 1002, 1003 (2d Dept. 2022) ("the court found that the mother's testimony 'completely lacked credibility,' while the father's testimony 'appeared straightforward and honest.'"). Second, and as will be discussed infra, Defendant's demeanor during trial is consistent with the evidence borne out at trial as to his pattern of behavior. He seeks to control the narrative, his surroundings, and—as was the case here—the Courtroom. Such an observation directly bears upon his character, his motivations, and the sincerity of his positions. See Bourne v. Birstow, 66 AD3d 621, 622 (2d Dept. 2009). Third, Defendant's testimony exposes inherent contradictions that prompt the Court to question his credibility. For example, Defendant maintains that the parties should be awarded joint legal custody and endeavor to make joint decisions together while also providing testimony that he has on more than one occasion directed the Children not to listen to their mother, Tr. at 82:11—83:11; 84 ("You don't let momma tell you anything"); Tr. at 397:14—16 ("Since momma hasn't told me about it, you just listen to poppa from now on"). In fact, the evidence showed that Defendant sought to eject Plaintiff from a medical appointment for their son, thereby illustrating his unwillingness to cooperate with Plaintiff on medical decision-making. See Pl. Ex. 44a. Another example is that of Defendant's application to the Court that the Children are raised as Christians where he provided no testimony that the parties either agreed to raise the Children as Christians or had a historical practice of engaging in the religion through, for example, attending religious services or receiving religious sacraments. Tr. at 1715—1716. 
Joint Custody is Not Tenable
The record establishes unequivocally that the parties' relationship has become so acrimonious that they cannot communicate or engage effectively in decisions that foster the best interests of the Children. See O'Connell v. McDermott, 80 AD3d 701, 701—702 (2d Dept. 2011) ("joint custody is encouraged 'as a voluntary alternative for relatively stable, amicable parents behaving in a mature civilized fashion'") (internal citations omitted). This position is shared by Plaintiff, the AFC ("decision-making involving the Children was a very big source of conflict and friction between the parties and that conflict spills over and effect the children," NYSCEF Doc. No. 570 (AFC Post-Tr. Sub. at 7), and the forensic evaluator, who finds that the "co-parent dynamic is completely dysfunctional." Favaro Report at 26. Examples of the acrimony plaguing the parties' relationship include, but are not limited to: the extensive motion practice and letter writing in this case, the allegations of domestic violence made by both parties towards each other, the ongoing Family Court proceedings, and the written communications (whereby the parties communicate exclusively using Our Family Wizard) and recordings of the parties referring to each other using demeaning terms such as "disgusting," "useless," "sick," and "asshole motherfucker."
Further, by the parties' own admissions, they are incapable of making joint decisions. For example, with respect to extra-curricular activities, Defendant testified that he objected to [REDACTED] playing lacrosse because it conflicted with swim lessons and threatened to involve the Court. Upon being asked by Plaintiff if he agrees to [REDACTED] participating in [*18]lacrosse, Defendant replied, "If you want to go to court about this willing to do that as well since you are now just being difficult about everything." Tr. at 433:16—434:13; Pl. Ex. 34i. Defendant further affirmed that he withheld consent for [REDACTED] to attend dance, which she had been participating in for a number of years, because during a phone call with Plaintiff, Plaintiff hung up on Defendant. Tr. at 435:8—439:14; Pl. Ex. 34e. Defendant further involves third parties in the parties' legal proceedings, and fails to productively communicate with Plaintiff directly to make decisions. For example, he engaged in a lengthy dialogue with [REDACTED]'s Girl Scouts leader and Plaintiff regarding an overnight trip. Tr. at 440:1—447:1; Pl. Ex. 34j (Defendant: "I did not know [[REDACTED]] was going. Since [Plaintiff] is refusing to confirm arrangements, please check with me so you know you have my consent."; Troop Leader: "For clarification, my communication was with your lovely daughter who called me."). 
Ultimately, there are examples abound of the parties' inability to jointly make decisions concerning even the most pedestrian of parental choices. Even with the assistance of a parenting coordinator, the parties have been unable to work productively together in the best interests of the Children. See, e.g., Pl. Ex. 34c (7/5/23—7/26/23 Commc'ns with [REDACTED]).
Best Interests of the Children
Based on the facts and evidence proffered at trial, the following non-exhaustive factors are of particular relevance to the issues of custody and access here: the stability of the parents, the ability to provide for the intellectual and emotional needs of the Children, the demonstrated willingness to prioritize the needs of the Children over the parties' own needs, the willingness to foster a relationship with the non-custodial parent, and the Children's desires. The Court also considers the testimony and incontrovertible evidence at trial demonstrating verbal abuse perpetrated by Defendant towards the Children. The Court observes that the record demonstrates that both parties have engaged in verbal abuse towards each other and name-calling in the presence of the Children. However, credible evidence at trial demonstrates that Defendant has directed verbal abuse and denigration towards the Children in a manner that jeopardizes their welfare and best interests. See Rupp-Elmasri v. Elmasri, 305 AD2d 393, 394 (2d Dept. 2003).
Stability of the Parents
The record demonstrates that Plaintiff is the more stable parent in a variety of respects. Plaintiff has held the same employment for twelve consecutive years and has "climbed the corporate ladder," whereas Defendant was sporadically employed throughout the marriage. As referenced supra, despite holding a master's degree from The Wharton School, Defendant did not work for an employer from approximately 2011 through 2016. Due to the parties' respective employment history, Plaintiff has provided financial support for the family for the majority of the marriage.
The Court further finds that Plaintiff is more emotionally stable parent. Despite the contentious history and myriad issues between the parties, there is no record of Plaintiff lashing out at third parties, let alone the Children. The same cannot be said for Defendant. For example, Defendant's behavior with [REDACTED]'s myofascial therapist, [REDACTED]'s girl scout leader, and [REDACTED] demonstrate his instability and lack of judgement in interacting with others and in areas that involve the Children. Tr. at 283:2—285:12; Pl. Ex. 34j; Tr. at 749:12—750:5.
Plaintiff maintains a supportive network of family and friends, and shares a close relationship with her mother, father, and step-mother—all of whom have cared for the Children during the marriage—as well has her extended family and Defendant's family. Conversely, Defendant is estranged from both of his siblings, and has proactively endeavored to prevent the Children from interacting with his family and Plaintiff's family. 
Ability to Provide for and Prioritize the Intellectual and Emotional Needs of the Children
The record demonstrates that Plaintiff is better suited to provide for the intellectual and emotional needs of each of the Children. The Court finds that Defendant has demonstrated a pattern and practice of taking on obstructionist positions and is unwilling to set aside his desire to win in favor of what is best for the Children. Often times, this "desire to win" runs counter to the advice and recommendations of professionals. Further, the record demonstrates that Defendant is unable to compartmentalize his animus towards Plaintiff and instead has weaponized his consent as a form of retribution towards Plaintiff. 
Regarding medical decisions, Defendant unreasonably insisted that [REDACTED]'s gastrointestinal issues stemmed from a fruit allergy, despite no evidence of the same following multiple allergy tests and input from medical professionals. Defendant withheld consent for [REDACTED] to consult with a gastrointestinal psychologist to address and resolve his stress, as recommended by his doctor. Tr. at 947:6—21. Defendant again threatened to withhold medical treatment during [REDACTED]'s myofascial therapy appointment in August 2022, due to his issues with Plaintiff's attendance at the appointment, resulting in the therapist terminating that particular therapy session with [REDACTED]. Tr. at 280:18—301:7; 1004:9—1009:19. Defendant also attempted to terminate [REDACTED]'s treating therapist without first consulting with Plaintiff. Tr. at 484:5—14. Defendant further sabotaged any chance of family therapy between himself and [REDACTED] when he attempted to call [REDACTED] testify and provide a report to the Court in preparation for trial, despite the Court's directive to the contrary. 
As to education, the evidence before this Court demonstrates Defendant's pattern of putting his own interests and beliefs before the Children's best interests. For example, Defendant insists that despite the Children's demonstrated academic success, they should supplement their math education with Kumon and Beestar workbooks. In an April 2021 incident, Defendant believed that [REDACTED] had cheated on his workbook and verbally abused the child in response and in front of his siblings, as evidenced on an audio recording. Pl. Ex. 38a-d. At the time of trial, Defendant testified that although he considered his tone in disciplining [REDACTED] a "parenting fail," his behavior was justified and was an appropriate response to the action because "it was [[REDACTED]'s] fault." Tr. at 670:5—672:19. Additionally, Defendant initially objected to [REDACTED]'s enrollment in a geometry class for seventh grade despite the input from her teachers and [REDACTED]'s wishes. The parties utilized a parent coordinator and sought input from the AFC to resolve the issue. Weeks later, Defendant consented "with reservation." Tr. at 1018:18—1022:16.
The record reveals that religion was not an issue during the parties' marriage, as the Children had never been affiliated with any particular religion, and that neither parent had discussed enrollment or affiliation with any particular religion. Plaintiff testified that she does not choose to raise the Children in any one particular faith, and that she believes the Children should be exposed to different beliefs and practices. Tr. at 990:14—994:16. Defendant testified to the contrary that the parties have raised their Children as Christians, as evidenced solely by [*19]the presence of bibles in the Marital Residence. Tr. at 1515:2—1518:4. Defendant seeks for the Children to be raised as Christians. Tr. at 1519:2—6. However, Defendant admitted that the family did not join a church and the Children have not received any religious sacraments. Rather, it appears to the Court that religion has manifest as an issue because Plaintiff has taken the Children to Shabbat services/dinners, to which Defendant does not consent. Tr. at 1519:7—1520:16.
Defendant maintains that Plaintiff has subverted the best interests of the Children by failing to intervene when Defendant is perpetuating verbal abuse upon the Children and instead recording such interactions. Specifically, Defendant identifies as examples the April 17, 2021, recording, wherein Defendant reprimands [REDACTED] for cheating on a Kumon workbook, and the August 15, 2022, recording, wherein Defendant reprimands the Children for visiting his brother. See NYSCEF Doc. No. 564 at 13—14 ("plaintiff made the judgement to expose her children not to just those first 10 minutes, but rather to all 27 minutes of the taped conservation . . . for purpose of trial preparation"). Defendant questions why Plaintiff would allow one or more of the Children to endure their father's abuse and not step in. Defendant's argument is nonsensical. 
While the Court does not encourage parties to engage in recordings of the other parents and/or children, a review of the facts surrounding these incidents suggests to this Court that, first, Plaintiff did nothing to create or fabricate these interactions for purposes of trial preparation and, second, any intervention by Plaintiff would have been futile. Rather, these incidents showcase Defendant's ill behavior and would have occurred regardless of whether Plaintiff recorded the incident. During the April 17, 2021, incident, Plaintiff reported that she attempted to put a stop to the abuse but was screamed at and told to "get the fuck out or else," and that she was making it worse. Favaro Report at 44. This report is consistent with Plaintiff's testimony at trial. See Tr. at 934:8—11. The August 15, 2022, incident occurred over FaceTime and the Children were not in the physical presence of their father. Plaintiff testified that after twenty-seven minutes of recording, she finally ended the call because "[i]t was just going on for too long. The kids were crying. I could hear them weeping." Tr. at 973 at 5—10. During the December 17, 2019, video recording wherein Defendant woke up the Children to inquire as to Plaintiff's involvement in their homework, Defendant was aware that he was being recorded and yet he was not deterred. Tr. at 964:7—12. In fact, his behavior was so rash that the Court simply cannot fathom what action Plaintiff could have possibly taken to get his behavior to cease. 
Fostering of a Relationship with the Non-Custodial Parent
The Court further finds that Plaintiff is more likely to foster a relationship with Defendant. "One of the primary responsibilities of a custodial parent is to assure meaningful contact between the children and the noncustodial parent, and the willingness of a parent to assure such meaningful contact between the children and the other parent is a factor to be considered in making a custody determination." Wright v. Perry, 169 AD3d 910, 911—912, 95 N.Y.S.3d 108 (2d Dept. 2019) (internal citations omitted). Here, Defendant's repeated statements to the Children and to third parties to discredit Plaintiff demonstrates his unwillingness to foster a relationship with Plaintiff. It is also apparent that positions taken by Defendant, such as choice of religion, are done so simply to oppose Plaintiff's positions, and not because those positions are in the Children's best interests. Plaintiff has demonstrated a superior ability to handle the antagonist nature of the parties' relationship and compartmentalize her [*20]feelings toward Defendant in a manner that serves the best interests of the Children.
The Desires of the Children
While the express wishes of the Children are not controlling, they are entitled to great weight, particularly where their age and maturity would make their input particularly meaningful. Matter of Manfredo v. Manfredo, 53 AD3d 498 (2d Dept. 2017); Matter of Oyefeso v. Sully, 148 AD3d 710 (2d Dept. 2017); Cook v. Cook, 142 AD3d 530 (2d Dept. 2016). In weighing the preference of the Children, the Court should consider the age and maturity of the child as well as the "potential for influence having been exerted on the child." Eschbach v. Eschbach, 56 NY2d 167, 173 (3d Dept. 1982).
The record is clear with respect to [REDACTED]'s lack of desire to spend time with Defendant, as well as the further deterioration of their relationship during these proceedings due to Defendant's actions. As the AFC points out in her post-trial submission, "the Father engaged in hurtful behavior towards her that undermined the progression of this development." NYSCEF Doc. No. 570 at 28. Defendant argues that "the Court's reduction of his access time with [[REDACTED]] has been too draconian and/or too reliant on the wishes that [[REDACTED]] has expressed." NYSCEF Doc. No. 564 at 6. Contrary to Defendant's assertions, the Court finds that there is no evidence or credible testimony to support a finding that the reduction in access time is "too draconian," that the reduction in access time stems from a singular event, and/or that the reduction in access is disproportionate to the serious issues raised to the Court concerning Defendant's interactions with [REDACTED]. Rather, the evidence supports a finding that the relationship between Defendant and [REDACTED] has deteriorated over time. Examples include but are not limited to Defendant removing [REDACTED]'s earrings with a wire cutter, Defendant withholding consent for [REDACTED] to participate in track, and Defendant preventing [REDACTED] from attending her best friend's Bat Mitzvah. The record further establishes that during the trial proceedings, Defendant addressed custody and access directly with [REDACTED] in direct contravention of Court orders. Defendant was ultimately held in criminal contempt and fined $1,000 for his conduct. Tr. at 411:1—433:13; NYSCEF Doc. No. 555 (12/19/23 Tr. ).
With respect to [REDACTED] and [REDACTED], while it is their wish to continue under the current 50/50 access schedule, this Court shares in Plaintiff's concerns that:
(1) the Defendant is exerting pressure over and instilling fear of consequences in [[REDACTED]] and [[REDACTED]], and (2) that Defendant will resort to the same behavior he used with [[REDACTED]] wherein the cycle of abuse will repeat itself. Plaintiff implores this Court to intervene now before Defendant can further harm the boys in the same way as he did [[REDACTED]]. [ . . . ] The Court, sitting parens patriae, has the opportunity to limit Defendant's access with [[REDACTED]] and [[REDACTED]] so as to relieve them of the immense stress and fear that they are clearly living under, and the harmful, future consequences of Defendant's actions. NYSCEF Doc. No. 558 at 21—22.
In addition, the Court is troubled by Defendant's practice of reprimanding and denigrating the Children in the presence of each other, and often pitting them against each other.
Verbal Denigration Towards the Children
The Court must evaluate, based on the totality of the circumstances, what is in the best the interests of the Children. Matter of Olea v. Diaz, 194 AD3d 721, 722 (2d Dept. 2021). Accordingly, the Court does not evaluate any specific piece of evidence or event in isolation. [*21]The unavoidable consequence of a custodial trial is that each party highlights the worst behavior of the other party, and while the Court must evaluate those highlights considering the context and the totality of circumstances, the fact remains that the party may have behaved in a way that is reprehensible despite the passage of time, the showing of contrition and accountability, and the benefit of hindsight. Here, Plaintiff has offered evidence in the form of testimony and documentation admitted at trial of verbal abuse and denigration towards the parties' three Children, and of embroiling the Children into the parties' disagreements. The below table sets forth examples of the types of statements said to the Children and proactive efforts to bring the Children into the marital strife:

Date

Incident

Statements

Exhibit

12/17/19

Defendant inquiring to Children about Plaintiff not assisting in homework

"[[REDACTED]] how much does momma spend time with you doing work? When was the last time momma did any school work with you?"
To [REDACTED]: "No it's not okay because momma doesn't spend any time doing work with you. She says she's going to spend time but she doesn't do any school work with you. Why is that?"
To [REDACTED]: "Get up"
"[[REDACTED]] when was the last time momma did some school work with you? Does momma do any school work with you? Does momma spend time doing any work books and stuff like that?"

Pl. 43a

4/27/21

[REDACTED] cheating on Kumon workbook

"You're so stupid, you don't understand how you're cheating yourself."
"It says something about you. That you're also lazy."

Pl. 38a-d

9/15/21

Defendant inquiring to Children about doctor's appointment

"I asked momma about your health and she refused to tell me about basic doctors visit so I can't trust momma anymore."
"Since momma still hasn't told me about it, you just listen to poppa from now on."

Pl. 41

11/19/21

Moving sick child to Defendant's room

"He cannot feel well in his bedroom. [[REDACTED]], you guys do not sleep in momma's room because I can't check on you, OK?"

Pl. 42

[*22]6/16/2021

Conversation with Children about family reunion

"Alright, I do not want you guys to go to the family reunion. If mom tells you to get in the car to go anywhere, you do not go. Do you understand? Do you understand? If mom yells at you or anything, you do not have to listen to her anymore. Do you understand? OK? And mom doesn't want us to go to [REDACTED]."

Pl. 39a
[*23]8/15/2022

Conversation with Children about vising to Defendant's brother's house

"So what did I tell you about going to [REDACTED]."
"So then why did you get out of the car once you were there?"
"So you guys got out and disobeyed me, you got out and disobeyed me, so I can't trust you guys anymore. Tell you what. Since you guys are going to disobey me when you're here, then you guys will not be able to do any of your activities. You won't be able to go to dance, and I won't give you my consent to anything. I told you. What did I tell you guys?"
"And you disobeyed me, so I can't trust you. What did I tell you about why not to go to my brother? Because he choked his wife and dragged her out of the shower and your mom is only doing that, that's why you guys disobey me. Was I"I don't care what momma says."
"You don't have to listen to momma anymore."
"Don't worry, I'm going to deal with mom in court, but you know what? You guys better, excuse me, fucking listen to me. You understand me?"
"So don't get out of the car, scream, you don't get out of the car, you say you want to go home, so you didn't try hard enough."
"You don't let momma tell you anything."
"Momma, listen, momma is going to get in trouble about this too. I'm going to take her to court about this."
"Have I told you can't go over to momma's family's house?"
"You were talking smack, [[REDACTED]]"
"You're going to run your mouth [[REDACTED]]"
"Yes [[REDACTED]], I heard, I heard what you said. People don't like people who are double-faced. Do you know what double-faced is? Well, when you're with me, you're like oh, yes poppa, yes poppa, and when you're with momma, you're going to talk smack, and the way I found out is because your mother recorded you. You think any of that is normal?"

Pl. 7a
Award of Legal Custody
Based on the foregoing, the Court finds that is it in the best interests of the Children to award Plaintiff sole legal custody of the parties' three children, [REDACTED], [REDACTED], and [REDACTED]. The Court directs that, following consultation with Defendant, Plaintiff shall have final decision-making authority as to all major decisions including medical/dental/psychological/psychiatric treatment, religion, education, and extra-curricular activities. Consultation shall mean that each party shall convey to the other party his/her opinions on whatever decisions affecting the Children need to be resolved via Our Family Wizard, setting forth the issue that needs to be resolved and that parent's proposed resolution at least three days in advance of such decision being made.
Final decision on that issue shall not be made until after consideration of the other parent's position, and a written response to same is made. The parties are encouraged to consider deferring to the professional in whatever field requires determination. In case of a medical emergency, each parent shall immediately, or as soon as practicable, notify the other. In such cases, the parent who has custody of the child is authorized to make emergent decisions consistent with the recommendations of the then present medical provider.
The Court further directs that the parties shall comply with the Children's Bill of Rights, which was marked as Court Exhibit I at trial and provided in hard copy form to the parties at trial.
Award of Physical Custody and Access
The Court rejects Defendant's contention that the access arrangement of 50/50 for all three children should remain. While the Court accords some weight to the opinion and recommendations of the Forensic Report, "they are not determinative and do not usurp the judgment of the trial judge." Koslowski v. Mangialino, 36 AD3d 916, 917 (2d Dept. 2007). Here, the Forensic Report stated that "changing the access schedule does nothing to repair the 'dysfunctional' relationship between the parties." While that may be the case, the paramount concern to this Court is fashioning an access schedule that best serves the Children when considering the evidence adduced at trial. Given the historical issues concerning Defendant's parenting style coupled with Defendant's interactions with the Children, the Court finds it in the best interests of the Children to place guardrails on Defendant's access with the Children so as to minimize and/or avoid any harmful future consequences of Defendant's actions. Accordingly, the Court awards Plaintiff primary physical custody of the parties' three children, subject to the access schedule as set forth herein.
In fashioning an access schedule, the Court is guided by a schedule that serves the best interests of the Children, and considers the stability and predictability of the schedule, the number of exchanges, and the ages of the Children. The Court directs that the parties adhere to the following access schedule for [REDACTED] and [REDACTED] to commence on May 6, 2024:
Week 1:

Monday

Tuesday

Wednesday

Thursday

Friday

Saturday

Sunday

[*24]Mother

After school or 3:00 p.m. if no school
Overnight

Overnight

Overnight

Overnight

Overnight

Father

After school or 3:00 p.m. if no school
Overnight

Overnight

School drop off or 3:00 p.m. if no school

Week 2:

Monday

Tuesday

Wednesday

Thursday

Friday

Saturday

Sunday

Mother

After school or 3:00 p.m. if no school
Overnight

Overnight

Start at 7:00 p.m. Overnight

Father

After school or 3:00 p.m. if no school
Overnight

Overnight

School drop off or 3:00 a.m. if no school

Overnight

Overnight

7:00 p.m. curbside drop off to Mother's home

All exchanges shall be at the Children's school or curbside at Plaintiff's residence, to the extent possible, so as to limit interactions between the parties.
With respect to [REDACTED], the Court directs that Defendant shall have dinner access with [REDACTED] on alternating Sundays from 4:00 p.m. to 7:00 p.m., and that [REDACTED] may expand her access with Defendant at her discretion to the extent of Defendant's access schedule with [REDACTED] and [REDACTED]. 
Holiday/Vacation Access and Travel
The Court directs the following except that, in accordance with the regular access schedule, it remains at the discretion of [REDACTED] as to whether she wishes to exercise overnight access with Defendant. The daytime holiday access schedule for [REDACTED] as and for any given holiday with Defendant will be from 10:00 A.M. until 8:00 P.M., or the end time listed below, whichever is earlier. 
Christmas and New Year's Day: Defendant shall have access for the first half of the break in even years and Plaintiff shall have access for the second half of the break in even years, with the reverse in odd years. The first half of the holiday shall commence at school pick up on the last day of school before break and end Christmas Day at 3:00 P.M. The second half of the break shall commence at 3:00 P.M. on Christmas Day until 12:00 P.M. on New Year's Day.
Martin Luther King, Jr. Day: Plaintiff shall have access in even years and Defendant shall have access in odd years. The holiday shall commence at school pick up on Friday preceding Martin Luther King, Jr. Day, and end Monday at 7:00 P.M.
Easter: Plaintiff shall have access in odd years and Defendant shall have access in even years. The holiday shall commence at 10:00 A.M. and end at 8:00 P.M.
Memorial Day: Plaintiff shall have access in odd years and Defendant shall have access in even years. The holiday shall commence at school pick up on Friday preceding Memorial Day and end Monday at 8:00 P.M.
Fourth of July: Plaintiff shall have access in even years and Defendant shall have access in odd years. The holiday shall commence on July 4 at 10:00 A.M. and end July 5 at 10:00 A.M.
Labor Day: Plaintiff shall have access in even years and Defendant shall have access in odd years. The holiday shall commence at 3:00 p.m. on the Friday preceding Labor Day, and end Monday at 8:00 P.M.
Columbus Day: Plaintiff shall have access in odd years and Defendant shall have access in even years. The holiday shall commence at school pick up on Friday preceding Columbus Day, and end Monday at 8:00 P.M.
Halloween: The Children shall be with the parent who has access in accordance with the regular access schedule.
Thanksgiving: Plaintiff shall have Thanksgiving access in even years and Defendant shall have access in odd years. The Thanksgiving holiday shall commence at school pick up on Wednesday preceding Thanksgiving and end the Friday following Thanksgiving at 12:00 P.M.
Winter Recess (school break): Plaintiff shall have access in even years and Defendant shall have access in odd years. The party exercising the break shall be entitled to seven (7) nights which shall include the party's previously scheduled weekend access.
Spring Recess (school break): Plaintiff shall have access in odd years and Defendant shall have access in even years. The party exercising the break shall be entitled to seven (7) [*25]nights which shall include the party's previously scheduled weekend access.
Summer Recess:[FN3]
Each party shall enjoy up to two (2) non-consecutive weeks of uninterrupted access during summer recess. In even years, Plaintiff shall have first choice of her access weeks and shall inform Defendant of the same as well as any planned travel by April 1. Defendant shall inform Plaintiff of his choice of access weeks as well as any planned travel by May 1. In odd years, Defendant shall have first choice of his access weeks and shall inform Plaintiff of the same as well as any planned travel by April 1. Plaintiff shall inform Defendant of her choice of access weeks as well as any planned travel by May 1. The foregoing shall be subject to the Children's summer camp schedule, which shall take priority.
Mother's Day / Father's Day: Plaintiff shall have access with the Children on Mother's Day from 10:00 A.M. until 7:00 P.M., and Defendant shall have access with the Children on Father's Day from 10:00 A.M. until 7:00 P.M., regardless of which parent would otherwise have the Children according to the schedule set forth herein. 
Children's Birthdays: The Children shall be with the parent who is enjoying access with the Children subject to the regular access schedule. The parent who does not have access on the particular child's birthday shall be afforded a two-hour period of continuous time with the Children on the child's respective birthday.
With respect to vacations and travel, the parties shall provide a written itinerary of the proposed trip, at the time notice is given, including without limitation, the airline or ground transportation to be used and the outbound and inbound flight/train numbers; time of departure and arrival at each of their destinations, the address(es) where the Children will be during their stay; the cellular number where the party may be reached and the land based and/or other access telephone numbers where the party/Children may be reached, if any. Last minute scheduling changes due to delay or any cause beyond a party's control shall be communicated to the other party as soon as possible.
Plaintiff shall keep the Children's passports in her possession. Defendant shall assist Plaintiff, if necessary, in obtaining and/or renewing the Children's passports. Each party shall provide the other with any documentation required by the traveling party with the Children outside of the United States. No international travel shall be permitted with the Children except countries who are part of the Hague Treaty. In the event either party seeks to travel internationally with the Children, as a condition to such travel, the travelling party shall: (i) travel only to countries that are active and participating members of the Hague Treaty on Child Abduction; (ii) travel only to countries that do not appear on any "watch" or "warning" list for United States citizens; (iii) provide the itinerary for such travel, including addresses for all locations where the Children will be sleeping and landline telephone numbers, as well as dates of travel, no less than thirty days in advance of said travel. Each party will cooperate with the other's efforts to travel internationally with the Children as set forth herein and as limited by their access time set forth in this Article.
Each party shall be entitled to reasonable, daily telephone, FaceTime, Skype, or similar contact with the Children when they are with the other party. The parties agree that they shall [*26]not interfere with communications so long as they remain reasonable.
Legal Analysis: Financials
The Court addresses the following unresolved financial issues: child support, add-on expenses, retroactive add-on expenses, college expenses; equitable distribution of the Marital Residence, bank accounts, and retirement accounts; equitable distribution of the marital portions of the parties' restricted stock units; wasteful dissipation of marital assets; and counsel fees. Neither party is seeking spousal maintenance.
Child Support, Add-On Expenses, and Retroactive Add-On Expenses
"The Child Support Standards Act 'sets forth a formula for calculating child support by applying a designated statutory percentage, based upon the number of children to be supported, to combined parental income up to a particular ceiling.'" Spinner v. Spinner, 188 AD3d 748, 751 (2d Dept. 2020), quoting Matter of Freeman v. Freeman, 71 AD3d 1143, 1144 (2d Dept. 2010); see DRL § 240(1-b)(c). "'Where the combined parental income exceeds that ceiling, the court, in
fixing the basic child support obligation on income over the ceiling, has the discretion to apply the factors set forth in Domestic Relations Law § 240(1-b)(f), or to apply the statutory percentages, or to apply both.'" Spinner, 188 AD3d at 751, quoting Candea v. Candea, 173 AD3d 663, 664 (2d Dept. 2019); see DRL § 240(1-b)(c)(3). "'The court must articulate an explanation of the basis for its calculation of child support based on parental income in excess of the statutory cap.'" Spinner, 188 AD3d at 751, quoting Candea, 173 AD3d at 665.
For purposes of calculating child support, Plaintiff's annual income is $611,816, see Pl. Ex. 3c (Pl. 2022 W-2), and Defendant's annual income is $381,645. Defendant's income is the sum of the following: Defendant's income reported on his W-2 of $313,810, see Pl. Ex. 3b (Def. 2022 W-2); annuity income of $10,709 as reported on his updated Statement of Net Worth, Def. Ex. B, and as corroborated by his testimony, Tr. at 2045:7—8; and rental income of $75,000 less expenses of $17,874—and not including depreciation—as reported on Schedule E of his 2022 tax return, see Pl. Ex. 3a (2022 Tax Return). See also NYSCEF Doc. No. 149 (1/20/23 Decision & Order) at n. 1 (declining to include a tax deduction for depreciation in calculating Defendant's income for child support purposes); Kessler v. Kessler, 47 AD3d 892, 895 (2d Dept. 2008) (finding that the court must reduce gross rental income by the amount of expenses for those rental properties); Andre v. Brumaire, 299 AD2d 355, 355—56 (2d Dept. 2002) ("the hearing examiner properly discredited the father's attempt to deduct depreciation from his rental income, as this is not an actual expense and has no bearing on his ability to provide support for his children"). 
Accordingly, the parties' combined adjusted parental income equals $953,849.86 (589,305.92 + 364,543.94), see DRL § 240(1-b)(c)(1), of which Plaintiff's income comprises 61.78% and Defendant's income comprises 38.22%. Multiplying the combined parental income up to the statutory cap of $183,000 by the appropriate child support percentage of 29% for three children yields an annual parental child support obligation of $53,070, of which 61.78% is to be paid annually by Plaintiff, or $2,732.30 per month, and 38.22% is to be paid annually by Defendant, or $1,690.20 per month. See DRL § 240(1-b)(c)(2). 
Next, because the combined parental income exceeds the statutory cap currently set at $183,000, the Court must determine the amount of child support, if any, for the amount of the combined parental income in excess of $183,000. Under the circumstances of this case and upon [*27]consideration of the statutory factors set forth in DRL § 240(1-b)(f)(1-10), including, among other things, the financial resources of the parties, the standard of living enjoyed by the Children during the marriage, the emotional health of the Children, and the articulated needs of the Children, the Court finds it just and appropriate to calculate child support based on combined parental income above the statutory cap up to $350,000. See Bari v. Bari, 200 AD3d 835, 838 (2d Dept. 2021); Sinnott v. Sinnott, 194 AD3d 868, 875 (2d Dept. 2021); Matter of Levin v. Blum, 167 AD3d 609, 611 (2d Dept. 2018). In reaching this determination, the Court considers the financial resources of each parent and the lifestyle it affords their Children. For example, the parties take regular vacations with the Children to destinations such as Park City and Puerto Rico. Defendant states that he spends $1,315 per month, or $15,780 annually, on vacations, which amount does not include family day and weekend trips. Def. Ex. B. Plaintiff states that she spends $550 per month, or $6,600 annually, on vacations. NYSCEF Doc. 437. On or off vacation, the Children participate in activities that require relatively expensive equipment such as ski equipment, see Tr. at 1851:1—4. The Children also require equipment associated with their activities and interests such as musical instruments and electronics. Tr. at 1850:8—21. The Court also considers the testimony and evidence bearing upon the medical needs of each of the Children considering their respective ongoing psychotherapy treatment and [REDACTED]'s medical history. 
The combined parental income above the cap is $167,000 ($350,000 less $183,000). Applying the statutory percentage of 29% for three children yields an annual parental child support obligation above the cap of $4,035.83, of which 61.78% is to be paid annually by Plaintiff, or $2,493.41 per month, and 38.22% is to be paid annually by Defendant, or $1,542.42. After adding that amount to Defendant's monthly pro rata share of the child support obligation up to the cap ($1,690.20), Defendant's total child support obligation for the Children to Plaintiff equals $3,232.62 per month.
Accordingly, commencing on the first day of the first full month after the date of this Decision After Trial, Defendant shall remit payment of $3,232.62 per month as and for child support. Upon emancipation of each child, child support shall be recalculated. 
Defendant shall maintain a life insurance policy in an amount sufficient to secure the payment of child support. See DRL § 236B(8)(a); Shvalb v. Rubinshtein, 204 AD3d 1059 (2d Dept. 2022).
The DRL provides that reasonable health care expenses not covered by insurance, the cost of health insurance, and childcare expenses should be allocated "in the same proportion as each parent's income is to the combined parental income." DRL § 240(1-b)(c)(4), (5)(ii). Here, Plaintiff shall continue to maintain health insurance for the parties' Children until their graduation from college or until Plaintiff is no longer able to provide dependent coverage for the Children under her insurance plan. Defendant is directed to pay his 38.22% pro rata share of the cost of providing health insurance benefits for the Children, which shall be added to Defendant's child support obligation. See id.; Candea, 173 AD3d at 666; Bauman v. Bauman, 132 AD3d 791, 793 (2d Dept. 2015). Defendant is further directed to pay his 38.22% pro rata share of the Children's future unreimbursed health care expenses and childcare expenses. See Strohli v. Strohli, 174 AD3d 938, 943 (2d Dept. 2019).
"Expenses for extra-curricular activities are not specifically delineated as an 'add on' under the Child Support Standards Act." Tuchman v. Tuchman, 201 AD3d 986, 992—993 (2d Dept. 2022). The Court considers the number of extra-curricular activities each of the Children [*28]historically has been enrolled in, including but not limited to: dance, basketball, swimming, Girl Scouts, tennis, soccer, academic enrichment, and violin. Plaintiff reports that she spends approximately $731 per month on the Children's extra-curricular activities or $8,772 per year, NYSCEF Doc. No. 437 (Pl. Updated SNW); Defendant reports that he spends approximately $1,570 per month, or $18,870 per year. Def. Ex. B (Def. Updated SNW). The parties also testified that the Children have attended summer camp and disclosed the same in their respective statements of net worth. See Tr. at 1851:12—22. The Court directs that the parties equally share (50%/50%) in the costs of the Children's extra-curricular activities and summer camps. Should the parties determine to enroll any or all of the three Children in private school education, each party shall equally share (50%/50%) in the costs of private school education.
Neither party requested the Court to address the tax deductions to which they may be entitled for the Children. Nevertheless, the Court addresses the issue to avoid any future disputes regarding which party is entitled to the deductions. Plaintiff shall be entitled to the deduction for the three children in the first such year, and Defendant shall be entitled to the deduction for the three children in the second such year, and the parties shall alternate each year thereafter. When there are two children, the parties shall split the number of children to be taken as a deduction during the years that an even number of children are eligible for a deduction. When there is only one child eligible to be taken as a deduction, Plaintiff shall be entitled to the deduction in the first such year, and the parties shall alternate until no children are eligible to be taken as a deduction. Defendant shall be entitled to the aforementioned tax deductions only if he is current on his child support obligations on the first day of the year for which the deduction is to be declared.
Finally, Defendant seeks reimbursement for mandatory and non-mandatory statutory add-ons including but not limited to: childcare, summer camp, educational enrichment, and extra-curricular activities. See Def. Ex. D (Chart: Children's Expenses, Healthcare, Childcare, Educations, and Activities with back up). The Court declines to award Defendant reimbursement as to any of these expenses and refers to its January 20, 2023 Decision & Order, wherein the Court denied Defendant's request for pendente lite relief finding that, inter alia, each party is capable of meeting the reasonable needs of the Children. See NYSCEF Doc. No. 149. The Court further finds that Defendant has not met his burden of establishing that these amounts were paid solely from his separate funds. For example, he provided as proof of payment for certain expenses his Chase bank statement for the accounting ending in x[REDACTED]. Pursuant to the testimony offered at trial, the account has been commingled with marital funds. See, e.g., Tr. at 2184:4—15. 
College Expenses/529 Accounts
"Payment[] for a child's college education is not mandatory, and absent a voluntary agreement, whether a parent is obligated to contribute to a child's college education is dependent upon the exercise of the court's discretion in accordance with Domestic Relations law § 240(1- b)(c)(7)." Morille-Hinds v. Hinds, 169 AD3d 896, 900 (2d Dept. 2019). "[U]nlike the obligation for unreimbursed medical expenses, educational expenses are not necessarily prorated in the same percentage as each parent's income bears to the combined parental income." Castello v. Castello, 144 AD3d 723, 728 (2d Dept. 2016).
Here, both parents attended reputable undergraduate and graduate institutions (i.e., Georgetown University, Cornell University, and The Wharton School), and have been successful [*29]in their academic pursuits. The record and the in camera testimony of each of the Children, including [REDACTED] at his young age, demonstrate that the Children are smart, driven, and ambitious. Each of the Children is thriving academically and involved in accelerated curriculums. Under these circumstances, the Court directs the parties shall equally share (50%/50%) in college expenses after first exhausting the respective child's 529 Plan(s) and scholarships. See Spinner v. Spinner, 188 AD3d 748, 754 (2d Dept. 2020). As used herein, college expenses include, room, board, tuition, books, college applications, and college preparatory courses and materials (i.e., SAT/ACT). 
The Court declines to impose a SUNY cap under the circumstances of this case, where both parties attended private undergraduate and graduate schools. See Pandis v. Lapas, 176 AD3d 837, 842 (2d Dept. 2019); Walker v. Walker, 130 AD3d 805, 806—807 (2d Dept. 2015).
Defendant is entitled to a room and board credit against his basic child support obligation during the periods when the Children are in school. See DRL § 240[1-b][c][7]; Rafferty v. Rafferty, 199 AD3d 725, 727 (2d Dept. 2021); Fiore v. Fiore, 150 AD3d 1205, 1207 (2d Dept. 2017).
Defendant is identified as the account owner for a New York 529 Plan for the benefit of their child, [REDACTED], with a Date of Commencement value of $118,081.10. Pl. Ex. 15 (529 Statements). The Court directs that the funds in the account are equally distributed to each of the three children and that both parties are designated as account owners/custodians of the accounts, which shall be used towards the respective child's college education. 
Equitable Distribution
Equitable distribution of marital property does not necessarily mean equal distribution. See Santamaria v. Santamaria, 177 AD3d 802, 804 (2d Dept. 2019); Culen v. Culen, 157 AD3d 926, 929 (2d Dept. 2018). "'Domestic Relations Law § 236 mandates that the equitable distribution of marital assets be based on the circumstances of the particular case and directs the courts to consider a number of statutory factors.'" Fairchild v. Fairchild, 149 AD3d 710, 710—711 (2d Dept. 2017), quoting Fields v. Fields, 15 NY3d 158, 170 (2010). "Those factors include: the income and property of each party at the time of marriage and at the time of commencement of the divorce action; the duration of the marriage; the age and health of the parties; the loss of inheritance and pension rights; any award of maintenance; any equitable claim to, interest in, or direct or indirect contribution made to the acquisition of marital property by the party not having title; and any other factor which the court shall expressly find to be just and proper." Taylor v. Taylor, 140 AD3d 944, 945—946 (2d Dept. 2016); see DRL § 236B(5)(d). "'While equitable distribution does not necessarily mean equal distribution, when both spouses have made significant contributions to a marriage of long duration, the division of marital property should be as equal as possible.'" Kamm v. Kamm, 182 AD3d 590, 591 (2d Dept. 2020), quoting Eschemuller v. Eschemuller, 167 AD3d 983, 985 (2d Dept. 2018).
"'A trial court is vested with broad discretion in making an equitable distribution of marital property, and 'unless it can be shown that the court improvidently exercised that discretion, its determination should not be disturbed.' Moreover, where, as here, "a determination as to equitable distribution has been made after a nonjury trial, the trial court's assessment of the credibility of witnesses and the proffered items of evidence is afforded great weight on appeal.'" Sufia v. Khalique, 189 AD3d 1499, 1500 (2d Dept. 2020)(internal citations omitted).
Marital property is defined in DRL § 236B(1)(c) as "all property acquired by either or both spouses during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action." Separate property is defined as including "property acquired before marriage" or "property acquired in exchange for or the increase in value of separate property, except to the extent that such appreciation is due in part to the contributions or efforts of the other spouse." DRL § 236B(1)(d)(1), (3).
After considering the aforementioned principles of law, the statutory factors, the testimony and evidence proffered at trial, and the circumstances of this particular case, the Court equitably distributes the marital property as follows.
Marital Residence
The parties purchased the Marital Residence, located at [REDACTED], on November 3, 2010, for a purchase price of $1,355,000. The parties paid for the purchase price as follows: Defendant's separate property of $600,000 in cash, Plaintiff's separate property of $100,000 in cash, a first mortgage loan from Wells Fargo of $655,000. The parties stipulated that the fair market value of the Marital Residence at the time of trial is $1,450,000—which amount is consistent with the Residential Appraisal Report of [REDACTED] dated August 23, 2023. Ct. Ex. 2 (Court Ordered Real Estate Appraisal). The parties do not dispute that they presently hold a mortgage with Chase wherein the total mortgage balance as of November 1, 2023, equals $313,447.41 (unpaid principal balance of $259,474.55 plus deferred balance of $53,972.76). See Pl. Ex. 9b (Chase Mortgage Statements); see also Tr. at 2100:3—10. The parties further stipulated at trial that Defendant incurred expenses for capital repairs to the Marital Residence pendente lite in the amount of $28,000. Tr. at 2110:3—9. 
The Court refers to its Decision and Ordered rendered from the bench on April 5, 2023, wherein the Court directed that the parties equally share the monthly mortgage amount and continue the status quo as to payment of homeowners' insurance, homeowners' association fee, and real estate taxes. NYSEF Doc. No. 226 (4/5/23 So Ordered Tr.).
While the parties stipulated at trial that the buyout price for Defendant to remain in the Marital Residence would be based off a market value of $1,450,000, Defendant has failed to offer any proof at trial that he has the ability to buyout Plaintiff's equity interest in the home and/or qualify for a mortgage. The parties also did not reach an agreement as to the disposition of the Marital Residence. 
The Court directs that the Marital Residence shall be listed on the market for sale with a licensed real estate broker mutually agreed upon by the parties within thirty days from the date of entry of the judgment of divorce. If the parties cannot agree on a broker, each party shall select a broker, both of whom shall co-list the Marital Residence for sale. The parties shall abide by the recommendation of the broker(s) and shall not act in any manner to interfere with the sale of the Marital Residence so as to ensure that the property is sold for an appropriate price in a timely manner. If the Marital Residence does not sell at the asking price within sixty days, the parties shall adjust the asking price as recommended by their broker(s). Upon receipt of an acceptable offer as provided herein, Defendant shall have the right of first refusal to bid and purchase the Marital Residence.
Upon the sale of the Marital Residence, the gross proceeds of the sale shall first be applied to the discharge of the existing mortgage in the amount of $313,447.41, the payment of the broker commissions, and the payment of usual and customary closing costs and adjustments. [*30]Each party is entitled to receive their separate property of $100,000 to Plaintiff and $600,000 to Defendant. Defendant is further entitled to a credit of $14,000 as and for the reasonable amount of capital repairs paid for by Defendant post-commencement, and as stipulated to by the parties. Subject to both parties being in full and complete compliance with DRL § 236B(6), the net proceeds shall be shared equally by the parties. 
The Court declines to credit Defendant for 50% of the deferred mortgage amount as there is absolutely no legal basis Defendant supplies for relieving him of said amount. The Court further declines to escrow the amount of $25,000 until the possible mold issue is remediated. The appraisal report explicitly considers the presence of possible mold in arriving at a valuation of the home. Def. Ex. 2 (8/23/23 Appraisal Report) ("There is evidence of water damage in the basement ceiling and wall, including possible mold."). Furthermore, Defendant was free to procure an estimate as to the cost associated with the possible mold as opposed to asking the Court to arbitrarily reserve $25,000; Defendant failed to do so and the Court to relies on the appraisal report. 
The Court declines to reallocate the mortgage payment along with any carrying costs associated with the Marital Residence. Historically and during the marriage prior to the mortgage going into forbearance, Plaintiff paid the entirety of the mortgage (~$4,500) and insurance (~$300) out of her personal checking account, while Defendant paid the homeowner's association fee (~$4) and real estate taxes (~3,020) out of his account. It was not until this Court's April 2023 Decision and Order that Defendant began contributing to the monthly mortgage amount. Since approximately December 2021, Defendant has enjoyed exclusive use and occupancy of the Marital Residence, while Plaintiff was compelled to temporarily reside with her father and stepmother, and then move into another residence, where she pays monthly rent of approximately $5,200. As determined by the Court in its January 20, 2023, Decision and Order and its April 5, 2023, Decision and Order, both parties earn more than sufficient income to cover their monthly expenses, including housing costs such as mortgage payments, taxes, home or renters' insurance and the like. Accordingly, the Court finds no basis to credit Defendant for any amounts paid towards the mortgage and/or real estate taxes since April 2023.
Bank and Brokerage Accounts
As stated in their Joint Statement of Facts, the parties do not dispute the distribution of funds and amounts with respect to the following marital accounts: JPM Chase ending in x[REDACTED]; JPM Chase ending in x[REDACTED]; JPM Chase ending in x[REDACTED], JPM Chase Savings ending in x[REDACTED];[FN4]
JPM Chase Savings ending in x[REDACTED]; JPM Chase Savings ending in x[REDACTED], Marcus by Goldman Sachs Savings ending in x[REDACTED]; Marcus by Goldman Sachs Savings ending in x[REDACTED]; Marcus by Goldman Sachs Savings ending in x[REDACTED]; Vanguard Brokerage ending in x[REDACTED]. The parties are directed to equally distribute the balance of the funds of each account using the date of commencement value, with the exception of the following: the parties distributed the funds for the Marcus by Goldman Sachs Savings accounts ending in [*31]x[REDACTED] and x[REDACTED]. Plaintiff deposited her share into JPM Chase ending in x[REDACTED], and Defendant waives any claim to this account. Defendant deposited his share into Marcus by Goldman Sachs Savings ending in x[REDACTED], and Plaintiff waives any claim to this account. 
Defendant disputes that the following accounts constitute marital property: JPM Chase ending in x[REDACTED], JPM Chase ending in x[REDACTED], Fidelity ending in x[REDACTED], Fidelity ending in x[REDACTED]; and E*Trade Account ending in x[REDACTED]. Pursuant to the testimony offered at trial, each of these accounts has been commingled with marital funds and therefore, do not separate marital property. See, e.g., Tr. at 2180—2189; see also NYSCEF Doc. No. 558 (Pl. Post Tr. Sub) at 30—31; see also Weiss v. Nelson, 196 AD3d 722 (2d Dept. 2021) (internal citations omitted). In essence, Defendant's testimony reveals that he transferred marital funds—here Plaintiff's bonus payment of $72,000—into the purported separate accounts. See supra at Section "Dissipation of Assets." Through Plaintiff's counsel's surgical questioning at trial, funds transferred into each of the accounts came from marital funds. Accordingly, the Court directs that the parties equally distribute the balance as of date of commencement for the following accounts: JPM Chase ending in x[REDACTED], JPM Chase ending in x[REDACTED], Fidelity ending in x[REDACTED], Fidelity ending in x[REDACTED]; and E*Trade Account ending in x[REDACTED].
Retirement Accounts
"[P]ension and retirement benefits belonging to either spouse attributable to employment during the marriage constitute marital property subject to equitable distribution upon divorce." McGrath v. McGrath, 261 AD2d 369, 370 (2d Dept. 1999). Here, the parties do not dispute the distribution of funds and amounts with respect to the following four marital retirement accounts: Plaintiff's Voya [REDACTED] Savings (date of commencement amount to be reduced by $141,170.78, which constitutes Plaintiff's separate property); Plaintiff's Voya [REDACTED] Deferral 401(k); Defendant's [REDACTED] 401(k) Savings; and Defendant's [REDACTED] 401(k) savings. The parties disagree as to the percentage that should be awarded of the marital portion for each of these retirement plans. Whereas Defendant argues that each of the accounts should be equally distributed, Plaintiff maintains that the Court should award her the entirety of her retirement accounts based on the statutory factors set forth at DRL §236B(5)(d). See NYSCEF Doc. No. 558 at 6—11. 
The Court, in its exercise of discretion and based upon consideration of the statutory factors, directs that the marital portion of each of the four aforementioned retirement accounts be divided equally between the parties and in accordance with the parties' stipulation as set forth on the record at trial. Tr. at 2087:1—2088:13. Any adverse tax consequences and penalties associated with an early withdrawal of funds from the retirement accounts by either party shall be borne entirely by that party.
Restricted Stock Units
Plaintiff was granted Restricted Stock Units (RSUs) from her employer during the marriage in 2019, 2020, and 2021. See Pl. Ex. 21c at 28—29 (4/1/21 Morgan Stanley Statement). Certain RSUs have vested, and others have not yet vested. Consistent with Plaintiff's testimony, [*32]if Plaintiff's employment with [REDACTED] terminates prior to the vesting date, "all unvested RSUs will be forfeited." Pl. Ex. 47b ([REDACTED] RSU Vesting Structure FAQs) at 5; Tr. at 1819:1—3. Furthermore, the plan documentation states that the employee will receive the RSUs at the vesting date "if certain conditions are met." Tr. at 2. Accordingly, because Plaintiff must continue to be employed on the vesting date in order for the RSUs to vest, the Court finds that the RSUs are compensation for future services—the RSUs have no value unless the employee is incentivized to remain employed as of the vesting date. The plan documentation admitted into evidence at Plaintiff's Exhibits 47a and 47b do not indicate otherwise, and Defendant does not posit any argument to the contrary that would suggest to the Court that the RSUs were granted as compensation for past services. See DeJesus v. DeJesus, 90 NY2d 643, 652 (NY 1997) ("The Trial Judge must first determine, based on competent evidence, whether and to what extent the stock plans were granted as compensation for the employee's past services or as incentive for the employee's future services."). 
On his updated SNW, Defendant disclosed that he was granted 344 shares of [REDACTED] in the form of restricted awards/units, with a value of $49,880 as of September 29, 2023. He states that the shares have not vested, and 36 shares were granted pre-commencement. Pursuant to Plaintiff's Exhibit 13c (Defendant's [REDACTED] RSUs), as of October 10, 2021, Defendant held 72 RSUs with a value of $12,255.84. Further, the documentation describes the RSUs as part of a "long-term incentive plan award agreement," and indicate that Defendant was granted 164 shares on January 17, 2023, 144 shares on January 18, 2022, and 72 shares on January 19, 2021—of which 36 shares vested on January 13, 2023, and 36 shares vested on January 13, 2024.
Pursuant to DeJesus, "a second time rule should be applied to determine the marital share, that is, accretions from the time of the grant until the matrimonial action was commenced, and any further accumulations attributable to the contributions of the nontitled spouse. Here, the numerator is the period of time from the date of the grant until the end of the marriage, which is the earlier of the date of the separation agreement or the commencement of the matrimonial action and the denominator is the period of time from the date of the grant until the stock plan matures." Id. at 90 NY2d at 652—53. The Court may then, in its discretion, determine how to equitably distribute the marital portion of the RSUs.
Defendant fundamentally misapprehends the case law in that he seeks an award of half of the RSUs as follows: a credit for half of the total shares that have vested and a directive that half of the shares that remain to be vested is distributed to him. Defendant is not entitled to 50% of the RSUs; rather, the Court makes the determination as to the equitable distribution of the marital portion of the RSUs. Additionally, the Court cannot direct the transfer of the unvested shares because, by definition, they have no value until they vest and the plan documentation explicitly states, "During the vesting period, you may not transfer or assign your RSUs to another party." Pl. Ex. 47b at 3.
Here, the Court directs that the marital portion of Plaintiff's and Defendant's RSUs granted prior to the date of commencement be divided equally between the parties according to the DeJesus formula, with any costs incurred in the calculation of said amount to be shared equally between the parties. Specifically, as to the RSUs that have vested and have been released to the parties, the Court directs that the marital portion should be valued as of the date of trial and determined pursuant to the DeJesus formula ((date of grant to date of commencement)/(date of grant to date of vesting)). With respect to the RSUs Plaintiff received [*33]on March 1, 2022, as part of her 2021 bonus payment, the Court—finding that these RSUs are to guarantee future performance for the reasons discussed supra—directs that the parties apply the same DeJesus formula to determine the value to be distributed to Defendant. The Court directs payment of said amounts within 30 days of this Decision After Trial. As to the RSUs that have not yet vested, the Court directs that the parties apply the same DeJesus formula and the then-share price for the parties' respective employers. The Court directs payment as and for said RSUs on an "if-as-and-when" basis within 30 days of vesting. 
Vehicles and Personal Property
The Court directs that each party shall retain the vehicle(s) in his or her possession and be responsible for the expenses associated with his or her vehicle(s). See Sawin v. Sawin, 128 AD3d 663, 668 (2d Dept. 2015) ("[s]ince there was no evidence as to the value of the parties' three vehicles, the Court cannot say that the Supreme Court improvidently exercised its discretion in the manner in which it distributed those vehicles.").
No evidence was offered at trial regarding the value of any furniture, household furnishings, or jewelry in the parties' possession. Each party shall retain his or her personal property, jewelry, and clothing.
Separate Property
In accordance with the parties' Joint Statement of Facts, the following constitutes Plaintiff's separate property: Fidelity IRA ending in x[REDACTED]; separate property portion of Plaintiff's Voya [REDACTED] Deferral 401(k) of $141,170.78 (see also Tr. at 1811:7—15), and $100,000 used towards the purchase of the Marital Residence. The following constitutes Defendant's separate property: [REDACTED]; Tesla automobile; Vanguard Rollover IRA account x[REDACTED]; Defendant's Vanguard Roth IRA account x[REDACTED]; Defendant's Vanguard Roth IRA account x[REDACTED]; Defendant's TIAA Savs/Invest. Plan account x[REDACTED]; Defendant's TIAA Savs/Invest. Plan account x[REDACTED]; Defendant's Fidelity Rollover IRA account x[REDACTED]; Defendant's Fidelity Rollover IRA account x[REDACTED]; Defendant's Fidelity Roth IRA account x[REDACTED]; Defendant's Fidelity SEP-IRA account x[REDACTED]; Defendant's Fidelity Roth IRA account x[REDACTED]; and $600,000 used towards the purchase of the Marital Residence. Each party shall retain his and her own separate property.
Dissipation of Assets
Plaintiff asserts that Defendant dissipated marital assets during the course of the marriage including $72,000 of Plaintiff's bonus income and additional monies up to approximately $600,000 in "reckless day trading." Plaintiff's counsel elicited testimony from Defendant that establishes that, between March 18 and 24, 2020, he executed three separate transfers from the parties joint savings account into his personal account and then engaged in short trades over the subsequent two months that resulted in losses, including the entirety of Plaintiff's bonus. The following chart summarizes the transfers with respect to Plaintiff's $72,000 bonus payment:

[*34]Date

Event

Exhibit

3/13/20

Plaintiff receives payment of $72,433.69 and deposits into JPM Chase x[REDACTED]

Pl. Ex. 17 at 62

3/18/20

At Defendant's direction, Plaintiff transfers $72,000 from JPM Chase x[REDACTED] to joint Marcus Savings x[REDACTED]

Id.; Pl. Ex. 12b at 29

3/18/20,
3/20/20,
3/24/20,
3/25/20

Defendant transfers a total of $100,000 from joint Marcus Savings x[REDACTED] to his JPM Chase x[REDACTED]

Pl. Ex. 12b at 29—31

3/19/20, 3/20/20, 3/23/20, 3/25/20

Defendant transfers a total of $100,000 from JPM Chase x[REDACTED] to his Fidelity x[REDACTED]

Pl. Ex. 10 at 537; Pl. Ex. 26a at 858

4/1/20—4/20/20

Defendant sustained $71,715.23 in change in investment value in Fidelity x[REDACTED]

Pl. Ex. 26a at 868

5/1/20—5/31/20

Defendant sustained $21,408.41 in change in investment value in Fidelity x[REDACTED]

Pl. Ex. 26a at 948

Based on the forgoing and the testimony in support thereto, Plaintiff requests that she is "made whole and reimbursed for that amount." Tr. at 1870:9. She further testified that Defendant "dissipated and lost hundreds of thousands of dollars, trading irresponsibly during our marriage including savings that were meant to be saving for our children . . . ." Tr. at 1959:3—5.In response, Defendant contends that, first, other than the $72,000 bonus payment, "any and all other losses" were "offset by other gains in asset classes." In reviewing the testimony on this proposition, the Court finds it uncompelling in that Defendant makes nothing more than conclusory statements that, for example, the value of Plaintiff's account in 2016 "was higher" [*35]than in 2011. Tr. at 2097:3—5. Second, Defendant argues that, by Plaintiff's own admission, the parties agreed that Plaintiff would manage the parties' finances given his financial background and qualifications. See Tr. at 1818:8—17 ("[Defendant] was to manage our finances."). Finally, Defendant argues that Plaintiff's position runs afoul of the Court of Appeals ruling in Mahoney-Buntzman v. Buntzman, 12 NY3d 415 (2009):
The Domestic Relations Law recognizes that the marriage relationship is an economic partnership. As such, during the life of a marriage spouses share in both its profits and losses. When the marriage comes to an end, courts are required to equitably distribute not only the assets remaining from the marriage, but also the liabilities. A trial court considering the factors set forth in the Domestic Relations Law has broad discretion in deciding what is equitable under all of the circumstances . . . However, during the life of any marriage, many payments are made, whether of debts old or new, or simply current expenses. If courts were to consider financial activities that occur and end during the course of a marriage, the result would be parties to a marriage seeking review of every debit and credit incurred. As a general rule, where the payments are made before either party is anticipating the end of the marriage, and there is no fraud or concealment, courts should not look back and try to compensate for the fact that the net effect of the payments may, in some cases, have resulted in the reduction of marital assets. Nor should courts attempt to adjust for the fact that payments out of separate property may have benefitted both parties, or even the nontitled spouse exclusively. The parties' choice of how to spend funds during the course of the marriage should ordinarily be respected. Courts should not second-guess the economic decisions made during the course of a marriage, but rather should equitably distribute the assets and obligations remaining once the relationship is at an end. Id. at 420—421.
The Court agrees with Defendant and is bound by the relevant legal precedent. The parties' utilization of marital funds to execute stock trades and investment decisions during the marriage should not be second guessed once the marriage has ended. There is no evidence that Defendant engaged in wasteful dissipation of these funds, rather it is equally possible that his trades could have resulted in gains to the parties. See, e.g., Marino v. Marino, 183 AD3d 813, 820 (2d Dept. 2020) (internal citations omitted) ("The party alleging that his or her spouse has engaged in wasteful dissipation of marital assets bears the burden of proving such waste by a preponderance of the evidence"); also Mage v. Mage, 174 AD3d 884 (2d Dept. 2019) ("A wasteful dissipation occurs when a party wrongfully reduces or extinguishes marital assets without a reasonable explanation, or with the intention of depriving the other spouse of that asset"); Eschemuller v. Eschemuller, 167 AD3d 983 (2d Dept. 2018); Wilner v. Wilner, 192 AD2d 524 (2d Dept. 1993); see also Kohl v. Kohl, 24 AD3d 219 (1st Dept. 2005) ("While there is considerable discretion in what amounts to waste, a wasteful dissipation of assets generally does not occur when marital funds are utilized to pay legitimate expenses or used to fund failed investments absent evidence of wrongdoing.")
Life Insurance
Plaintiff testified that she has two life insurance policies with Northwestern Mutual: a whole life policy (x[REDACTED]) with a cash surrender value of approximately $38,000 to $40,000 and a term life policy (x[REDACTED]). Def. Ex. FF (6/13/23 Northwestern Mutual St.); Tr. at 1872:4—16. Both policies were acquired prior to the marriage in 2007, although Plaintiff testified that premiums were paid during the marriage. Defendant holds a whole life [*36]policy with Mass Mutual (x[REDACTED]) with a face value of $1,000,000 and a cash surrender value of $45.63 as of December 31, 2020; the policy was acquired before the marriage in 2006. Pl. Ex. 29 (1/1/20 Mass Mutual St.). 
Generally, "the cash surrender value of the plaintiff's life insurance policy is marital property subject to equitable distribution." Miller v. Miller, 150 AD2d 652, 653 (2d Dept. 1989). However, the parties did not provide the Court with what portion of the policies should be deemed as marital for purposes of equitable distribution, let alone the appreciated cash value of the policies. See La Barre v. La Barre, 251 AD2d 1008 (4th Dept. 1998) (court did not "err in failing to order equitable distribution of cash surrender value of plaintiff's life insurance policy; although some of premiums were paid during marriage, evidence was not clear and defendant failed to submit sufficient evidence to allow court to make determination as to percentage, if any, of this policy which should be treated as marital property").
Here, the Court has no basis to award either party a portion of the appreciated net cash value of the life insurance policies. Additionally, the Court determines that the most equitable solution is for each party to maintain his/ her existing polic(ies), where the policies were acquired prior to the marriage and, with respect to Defendant, the Court directs herein that Defendant shall maintain a life insurance policy in an amount sufficient to secure the payment of child support.
Counsel Fees
Defendant asserts that Plaintiff is the monied spouse and therefore is not entitled to an award of counsel fees in the amount of $300,000, as and for the custody portion of the trial. Defendant is not seeking counsel fees. Tr. at 1852:2—8; 2129:3—5. Plaintiff asserts that Defendant has prolonged this litigation by, for example, taking positions that are not ground in the law, employing aggressive tactics such as frivolous motion practice, and refusing to engage in good faith negotiations. Tr. at 1998:18—1999:3. Further, Plaintiff argues that Defendant's practice of hiring and firing law firms has resulted in multiple delays to this matter (Defendant has thus far engaged six attorneys on this matter).[FN5]
 
The Affirmation submitted by Plaintiff's counsel attaches the signed retainer agreements (dated September 22, 2022; March 1, 2023; and May 1, 2023), which provide the date of engagement, qualifications of counsel, and hourly billing rates, as well as true copies of Plaintiff's invoices. NYSCEF Doc. Nos. 560—563. Based upon the Court's review of said invoices, the Court is satisfied that the counsel fees billed by Plaintiff's counsel are reasonable given the issues in this case, the procedural history of this case, and the need to litigate both custody and finances.
By statute, there is "a rebuttable presumption that counsel fees shall be awarded to the less monied spouse." DRL § 237(a). "In exercising judicial discretion to determine counsel fee applications, the courts must consider not only the financial circumstances of the parties but the circumstances of the case as a whole, including the relative merits of the parties' positions and whether either party has delayed the proceedings unreasonably or engaged in unnecessary litigation. A less-monied spouse should not be expected to exhaust or spend down a prospective or actual distributive award in order to pay counsel fees as the result of unreasonable or [*37]excessive litigation conduct by the adverse party. On the other hand, the more affluent spouse should not be treated as an open-ended checkbook expected to pay for exorbitant legal fees incurred by the less affluent spouse through excessive litigation or the assertion of unreasonable positions." Kaufman v. Kaufman, 189 AD3d 31, 74—75 (2d Dept. 2020).
The record in this case demonstrates that while both parties have engaged in motion practice, Defendant, in particular, has demonstrated conduct and adopted positions that prolonged this case and caused unnecessary litigation. By way of example, on August 22, 2022, Defendant moved by Order to Show Cause for the Court to, inter alia, adjudicate Plaintiff in contempt and suppress evidence of recordings of Defendant and the Children, including the August 16, 2022, recording concerning the Children's visit to their uncle's home (Mot. Seq. No. 1). Said Order to Show Cause was not signed. Defendant then moved by Order to Show Cause on September 21, 2022 (Mot. Seq. No. 3) for the same relief, which was denied by this Court on the basis that there was no legal basis for the relief sought—i.e., the recordings did not amount to eavesdropping under the statute and Defendant did not have standing to challenge the admissibility of the recording. NYSCEF Doc. No. 149 (1/20/23 Decision & Order).
The Court further observes that each time Defendant has changed counsel, said event is precipitated by motion practice that has required the participation of Plaintiff and her counsel, thereby incurring legal fees and expenses to Plaintiff. See Mot. Seq. Nos. 4, 5, and 8. It is worth noting that after BodnarMilone was relieved for the second time, Defendant elected to proceed pro se, then retained new counsel on the eve of trial. The Court further refers to its discussion in this Decision After Trial regarding Defendant's unilateral actions to enlist [REDACTED], [REDACTED]'s treating physician, as a witness at trial and the corresponding motion in limine as well as the criminal contempt proceedings due to Defendant's noncompliance with the directives of the Court. Finally, as discussed in the context of Defendant's credibility at trial, his lack of cooperation when giving testimony necessitated breaks during the trial proceedings, thereby causing further delays. Undoubtedly, Defendant's non-compliance with Court orders and basic directives of the Court led to an unreasonable delay in the proceedings and additional counsel fees. See Y.B. v. G.B., 174 N.Y.S.3d 820 (Sept. 16, 2022) ("The Court finds that Wife's poor treatment of her attorneys, the lack of respect she has shown for their professional ethics, and her refusal to follow their legal advice, unnecessarily delayed these proceedings and incurred thousands of dollars in avoidable legal fees").
Under these circumstances, and considering the merits of the parties' respective positions, the degree to which each party sought to reasonably resolve the matter without resorting to trial, and the financial circumstances of the parties, the Court awards Plaintiff counsel fees in the amount of $50,000. Such payment shall be made by Defendant to Plaintiff's counsel within sixty (60) days of the date of this Decision After Trial.
The Court has considered the additional contentions raised by the parties and finds them to be without merit. All claims for relief not specifically addressed herein are denied.
Conclusion
Accordingly, it is hereby,
ORDERED that Plaintiff is granted a divorce on the ground set forth in DRL § 170(7); and it is further
ORDERED that Plaintiff shall be awarded sole legal custody and primary physical custody of the parties' children, [REDACTED] (born on [REDACTED]), [REDACTED] (born [*38]on [REDACTED]), and [REDACTED] (born on [REDACTED]), subject to the access schedule set forth herein and to commence on May 6, 2024. The Court directs that, following consultation with Defendant, Plaintiff shall have final decision-making authority as to all major decisions including medical / dental / psychological / psychiatric treatment, religion, education, and extra-curricular activities; and it is further
ORDERED that commencing on the first day of the first full month after the date of this Decision After Trial, Defendant shall remit payment of $3,232.62 per month as and for child support. Upon emancipation of each child, child support shall be recalculated; and it is further
ORDERED that the parties shall share in the costs of statutory add-on expenses on a pro rata basis. Plaintiff shall be responsible for 61.78% of those expenses, and Defendant shall be responsible for 38.22% of those expenses; and it is further
ORDERED that Plaintiff shall continue to maintain health insurance for the parties' Children until their graduation from college or until Plaintiff is no longer able to provide dependent coverage for the Children under her insurance plan; and it is further
ORDERED that Defendant is directed to pay his 38.22% pro rata share of the cost of providing health insurance benefits for the Children, which shall be added to Defendant's child support obligation; and it is further
ORDERED that the parties shall equally (50%/50%) share in costs and expense associated with the Children participating in summer camp and extra-curricular activities, as well as private school education should any of the Children enroll in private school; and it is further
ORDERED that Defendant shall maintain a life insurance policy for the benefit of the Children until payment of child support is completed and in an amount sufficient to secure that obligation; and it is further
ORDERED that Plaintiff shall be entitled to the deduction for the three children in the first such year, and Defendant shall be entitled to the deduction for the three children in the second such year, and the parties shall alternate each year thereafter. When there are two children, the parties shall split the number of children to be taken as a deduction during the years that an even number of children are eligible for a deduction. When there is only one child eligible to be taken as a deduction, Plaintiff shall be entitled to the deduction in the first such year, and the parties shall alternate until no children are eligible to be taken as a deduction. Defendant shall be entitled to the aforementioned tax deductions only if he is current on his child support obligations on the first day of the year for which the deduction is to be declared; and it is further
ORDERED that the parties shall equally (50%/50%) share in the cost of all college expenses, which includes room, board, tuition, books, college applications, and college preparatory courses and materials. The parties must first exhaust the funds in the Children's respective 529 accounts and any scholarships before the parties are obligated to contribute toward the Children's college expenses. Defendant is entitled to a room and board credit against his child support obligation during the periods when the Children are in school; and it is further
ORDERED the Marital Residence shall be listed on the market for sale with a licensed real estate broker mutually agreed upon by the parties within thirty (30) days from the date of entry of the judgment of divorce. Proceeds from the sale of the Marital Residence shall be distributed as directed herein; and it is further
ORDERED that the parties shall equally distribute the balance as of date of commencement for the following savings, checking, or other non-retirement accounts within [*39]sixty (60) days of this Decision After Trial: JPM Chase ending in x[REDACTED]; JPM Chase ending in x[REDACTED]; JPM Chase ending in x[REDACTED], JPM Chase Savings ending in x[REDACTED]; JPM Chase Savings ending in x[REDACTED]; JPM Chase Savings ending in x[REDACTED], Marcus by Goldman Sachs Savings ending in x[REDACTED]; Marcus by Goldman Sachs Savings ending in x[REDACTED]; Marcus by Goldman Sachs Savings ending in x[REDACTED]; Vanguard Brokering ending in x[REDACTED], JPM Chase ending in x[REDACTED], JPM Chase ending in x[REDACTED], Fidelity ending in x[REDACTED], Fidelity ending in x[REDACTED]; and E*Trade Account ending in x[REDACTED]. The parties have already distributed the funds for the Marcus by Goldman Sachs Savings accounts ending in x[REDACTED] and x[REDACTED]. Plaintiff deposited her share into JPM Chase ending in x[REDACTED], and Defendant waives any claim to this account; Defendant deposited his share into Marcus by Goldman Sachs Savings ending in x[REDACTED], and Plaintiff waives any claim to this account; and it is further
ORDERED that the funds in [REDACTED]'s New York 529 Plan are equally distributed to each of the three children and that both parties are designated as account owners/custodians of the accounts, which shall be used towards the respective child's college education; and it is further
ORDERED that the marital portion of the parties' retirement accounts, which include Plaintiff's Voya [REDACTED] Savings (date of commencement amount to be reduced by $141,170.78, which constitutes Plaintiff's separate property); Plaintiff's Voya [REDACTED] Deferral 401(k); Defendant's JPM 401(k) Savings; and Defendant's [REDACTED] 401(k) savings, shall be divided equally between the parties and in accordance with the parties' stipulation as set forth on the record at trial, as referenced herein. The parties are directed to obtain and submit a proposed Qualified Domestic Relations order or Domestic Relations Order, whichever applicable, with notice of settlement, to the Court within sixty (60) days of the date of this Decision After Trial; and it is further
ORDERED that any adverse tax consequences and penalties associated with an early withdrawal of funds from the retirement accounts by either party shall be borne entirely by that party; and it is further
ORDERED that the marital portion of the parties' Restricted Stock Units shall be distributed according to the DeJesus formula and as directed herein, with any costs associated with calculating said amount to be born equally by both parties; and it is further
ORDERED that each party shall retain the vehicle(s) in his or her possession and be responsible for the expenses associated with his or her vehicle(s), and it is further
ORDERED that Plaintiff is awarded counsel fees in the amount of $50,000. Such payment shall be made by Defendant to Plaintiff's counsel within sixty (60) days of the date of this Decision After Trial; and it is further
ORDERED that Plaintiff shall settle Findings of Fact and Conclusions of Law, a Judgment of Divorce, and all other documents necessary to allow the Court to enter Judgment in accordance with this Decision After Trial, on at least five (5) days' notice, within thirty-five (35) days of the date hereof. Failure to timely settle the Findings of Fact and Judgment of Divorce may result in this action being dismissed, or other appropriate sanctions; and it is further
ORDERED that all other relief requested and not decided herein in denied.
The foregoing constitutes the Decision and Order of this Court. The provisions hereof shall be incorporated into the proposed Judgment of Divorce and Findings of Fact at the [*40]conclusion of this matter. 
Dated: April 25, 2024
White Plains, New York
HON. ANAR RATHOD PATEL, A.J.S.C.

Footnotes

Footnote 1:During the trial proceedings, the parties further appeared before the Court on November 21, 2023, with respect to addressing holiday access, and December 19, 2023, with respect to criminal contempt proceedings as to Defendant. See NYSCEF Doc. Nos. 555 (12/19/23 So Ordered Tr.); 523 (12/19/23 Short Form Order).

Footnote 2:This Court notes that the total monthly expenses reflected on Defendant's updated SNW is incorrectly listed as $803 (only includes $725 in miscellaneous expenses plus $78 in other expenses).

Footnote 3:With respect to the summer of 2024, Plaintiff shall notify Defendant of travel plans by June 1, and Defendant shall notify Plaintiff of travel plans by June 15, with summer camp for the Children taking priority.

Footnote 4:In her Statement of Proposed Disposition and the Joint Statement of Facts, Plaintiff identifies this account as marital; in his corresponding document, Defendant identifies this account as Plaintiff's separate property. The Court resolves this apparent contradiction by following the Joint Statement of Facts and treating this account as marital.

Footnote 5:The Court's records show that Defendant has engaged five attorneys.